**In re SAL CARUSO CHEESE, INC., Debtor.**

**Bankruptcy No. 88–01008.**

United States Bankruptcy Court, N.D. New York.

July 17, 1989.

Frank G. Pratt, Utica, N.Y., for debtor.

Kim F. Lefebvre, Richard D. Croak, Albany, N.Y., Office of U.S. Trustee.

Kernan & Kernan, Utica, N.Y. (Gregory A. Hamlin, of counsel), for Key Bank of Central New York, N.A.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

The United States Trustee ("UST") has moved the Court for an order converting this voluntary Chapter 11 case to a case under Chapter 7, or in the alternative, dismissing the case, contingent upon payment of all fees due and owing it pursuant to 28 U.S.C. § 1930(a)(6) (West 1989).

The UST's motion, made pursuant to § 1112(b) of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (West 1979 & Supp. 1989) ("Code"), was initially made returnable before this Court on August 31, 1988 and then adjourned to September 28, 1988 at which point Key Bank of Central New York, N.A. ("Key Bank") appeared in support. Thereafter, the UST and Sal Caruso Cheese, Inc. ("Debtor") executed a Stipulated Order entered October 7, 1988 which, while not disposing of the merits of the motion, did, in pertinent part, require the Debtor to file a Plan and Disclosure Statement by November 9, 1988, provide the UST with proof of insurance on certain real property of the Debtor, and segregate rents being received from that same property, or face immediate conversion to Chapter 7.

The motion was further adjourned on consent of the UST and Debtor's counsel to the date on which the hearing on the approval of Debtor's Disclosure Statement was scheduled and was thereafter adjourned several times until February 24, 1989, when an evidentiary hearing was commenced in Utica, New York. That hearing was resumed and concluded on March 3, 1989, and the Court took the matter under submission on March 23, 1989.

### JURISDICTIONAL STATEMENT

The Court has jurisdiction of the parties and subject matter pursuant to 28 U.S.C.A. §§ 1334 and 157 (West Supp.1989). This is a core proceeding, 28 U.S.C.A. § 157(b)(2)(A) and (O). The following con-

stitutes findings of fact and conclusions of law rendered in accordance with Bankruptcy Rules ("Bankr.R.") 1007, 1009, 1017, 2002, 7052, 9006, 9014 and 9017.

## FACTS

On June 30, 1988, the Debtor, a closely held New York corporation, filed a voluntary petition pursuant to Chapter 11 of the Code, listing $734,530.81 in debt and $720,296.49 in property and identifying Salvatore R. Caruso ("Caruso") as its president and the sole stockholder of its 100 registered shares of common stock. *See* Movant's Exhibit A (copies of Petition, Schedules A–1, A–2, A–3 and amendments filed October 4 and December 15, 1988, Statement of Financial Affairs For Debtor Engaged In Business ("Statement") and related exhibits). Caruso is also a Chapter 13 debtor before this Court. In an Exhibit A, the Debtor claimed $409,318.00 in total assets and $702,871.00 in current and short term liabilities, referencing to an April 30, 1988 balance sheet. *Id.*

Schedule B–1 identified "1004 Tilden Avenue, Utica, New York, Belle Avenue, Utica, New York, 1326 Rutger Street, Utica, New York, 1012 Tilden Avenue, Utica, New York" as real property, with a market value of $168,500.00, in which the Debtor held a "fee title" interest. *Id.* In an Order entered January 31, 1989, the Court approved the sale of the Rutger Street property for the sum of $40,000.00 and the application of the net proceeds of $37,206.00 to the City of Utica ("City"). The City was listed in Schedule A–2 as holding a claim for $75,569.39 secured by a first mortgage on 1010 Tilden Avenue, Utica, New York ascribed a market value of $168,500.00. *Id.*

Included in Schedule B–2 as the Debtor's personal property was $59,455.54 in inventory, down from $62,946.00 as of April 30, 1988 in item four of the Statement, $84,098.22 in accounts receivables, $120,000.00 of equipment at 1010 Tilden Avenue, six vehicles valued at $79,000.00 (one 1985 Mercedes–Benz truck, two 1984 Chevrolet trucks, one 1984 International truck, one 1986 Ford truck and an "Omega"),

$9,242.73 in Key Bank checking account # 236001954 and a $200,000.00 counterclaim in a state court action commenced by Moscahlades Bros., Inc. *Id.* A statement dated June 30, 1988 for the Key bank checking account indicated a balance of $2,525.71 on that date. *See* Movant's Exhibit O (copies of bank statements from March 31, 1988 through July 14, 1988).

The Order setting August 9, 1988 as the first meeting of creditors pursuant to Code § 341, as well as containing notice of the automatic stay and a November 7, 1988 bar date for filing proofs of claim was circulated to all entities on the mailing matrix upon its entry July 12, 1988. It appears from the case docket that the Code § 341 meeting was either adjourned to or continued on September 27, 1988, October 25, 1988, November 8, 1988, November 27, 1988, January 24, 1989 and March 7, 1989. The Debtor filed a Resolution on July 15, 1988 empowering Caruso to take the necessary steps on its behalf to facilitate the bankruptcy. On August 1, 1988, the UST appointed the committee of unsecured creditors pursuant to Code § 1102(a)(1).

At the time of filing, it appears that the Debtor, which specialized in retail and wholesale cheese processing and distribution, was a going concern located in Utica, New York. Prior to the fall of 1987, the Debtor had also produced cheese for sale, but had since terminated that portion of its business. Federal income tax returns for the years 1985, 1986 and 1987 indicated gross receipts or sales in those years of between $2.3 million and $3.8 million. *See* Movant's Exhibit E (copy of proof of fire loss).

When it filed its Chapter 11 petition, the Debtor was engaged in litigation with the United States Department of Labor regarding the status of its truck driver/salesmen and so reflected in its Schedule A–1 as a disputed claim for $80,000.00 and at item twelve of its Statement. *See* Movant's Exhibit A. That litigation was continued postpetition in the United States District Court for the Northern District of New York when that Court apparently concluded that the stay imposed pursuant to Code § 362(a)

was inapplicable. An Order Authorizing Compromise Pursuant To Bankruptcy Rule 9019(a) was entered December 20, 1988, wherein the Court approved a settlement in the sum of $30,000.00.

Subsequent to filing, and on or about August 11, 1988, the Debtor's main business premises at 1010 Tilden Avenue were substantially destroyed by a fire, effectively causing a cessation of all of Debtor's business operations. Debtor's Amended Disclosure Statement noted that this interruption to its business resulted in a reduction to its work force of one employee, Caruso. *See id.* at 2.

On September 9, 1988, the Court, on application of the Debtor, appointed the licensed public adjustment firm of Basloe, Levin & Cuccarro, Ltd. ("Basloe") to independently prepare, present and adjust the claim for the loss or damage caused by the fire as demanded by its insurer carrier under its three policies. *See* Movant's Exhibit P (copy of letter from Bouck, Holloway, Kiernan and Casey, Esqs. to Sal Caruso Cheese, Inc. (Sept. 9, 1988)); Movant's Exhibit R (copy of transcript of Caruso's sworn examination conducted on November 4, 1988). Completed on November 4, 1988 and filed on November 7, 1988, the proof of fire loss fixed the Debtor's loss at $440,154.94 which was approximately allocated to a building loss of $300,154.94, a building contents loss of $120,000.00—including plant, store and office stock, supplies and equipment—and a business interruptions loss of $20,000.00. *See* Movant's Exhibit E. It also indicated that the Debtor's business was "completely closed" and that it would take in excess of twelve months to rebuild the premises. *See id.*

At the time of the hearing on this contested matter, the Home Insurance Company, Debtor's insurer, had not voluntarily paid any portion of the fire loss and Debtor's counsel had demanded a written explanation for its failure to pay the Debtor's claim. *See* Debtor's Exhibit 8 (copy of letter from Frank G. Pratt, Esq. ("Pratt") to Bouck, Holloway, Kiernan & Casey, Esqs. (Feb. 22, 1989)).

On November 7, 1988, the Debtor filed a Disclosure Statement and Plan of Reorganization.

At the hearing held before the Court on the instant motion, Caruso, who identified himself as the Debtor's president and sole stockholder, testified that it was his intention to utilize the yet to be received fire insurance proceeds to reopen the Debtor's retail store first and then revive its wholesale operation.

On cross-examination by the UST, Caruso testified that on the night of the fire he was playing cards with several men at an athletic club, but that he could only recall the name of one of the card players. Caruso also recalled being questioned by the insurance company's attorney about a container of gasoline found at the fire scene but did not remember being told that the fire marshall is alleged to have found that an accelerant had been used in connection with the fire. *See generally* Movant's Exhibit R.

In preparing the proof of fire loss, Caruso utilized a list of equipment he had made in October or November of 1987 when the Debtor ceased cheese production. Caruso denied that any of the equipment listed in the proof of loss had been transferred prior to the fire to Falbo Dairy of Carbondale, Pennsylvania ("Falbo"), owned by his cousin, or Cheese's of Monroe ("Monroe").

Caruso also testified that he had been a patient at the Duke Medical Center in North Carolina, suffering ·from uncontrolled diabetes, in the spring of 1988 prior to the filing. Caruso acknowledged that since the filing of the petition he draws the sum of $250.00 per week from the Debtor. However, he was unclear on whether that weekly amount, from which no tax is deducted, is treated as salary or the repayment of prepetition loans he made to the Debtor. The answer to question nineteen in the Statement regarding withdrawals indicated that he was the recipient of "$12,750.00 (1986 W–2)." *See* Movant's Exhibit A.

Caruso filed three separate proofs of claim in this Chapter 11 case totalling $174,563.54, based upon loans made to the

Debtor between 1984 and 1988 and pre-petition wages. *See* Movant's Exhibits G, H, I (copies of proofs of claim filed by Salvatore R. Caruso on Oct. 3 and 18, 1988). He acknowledged that there were no written notes evidencing the loans he personally made to the Debtor as reflected on the proof of claim and that the Debtor had made substantial payments to him personally during the same period. However, Caruso was unsure whether some of these payments were salary or loan reductions. *See* Movant's Exhibit I.

Schedule A-3 listed a claim in the amount of $189,000.00 to Caruso and his wife, Desdemona Caruso ("Mrs. Caruso"), for "loans to corporation." *See* Movant's Exhibit A. Caruso's priority and unsecured wage claims were added to Schedules A-1 and A-2, respectively, in amendments filed October 4, 1988. *See id.* Mrs. Caruso filed a proof of claim in the amount of $34,476.95 on October 18, 1988, attaching the same account sheet appended to Caruso's proof of claim, Movant's Exhibit I, which showed an aggregate balance as of August 31, 1988 of $205,933.35 from loans made from 1984 to 1988.

On direct examination by the UST, Caruso acknowledged that within ninety days prior to filing the petition, Debtor was making payments to Jefferson Cheese Mfg. Inc. ("Jefferson"), a major supplier, on past due accounts, as well as paying for current deliveries. *See* Movant's Exhibit C (copies of invoices and checks from March 18, 1988 through July 26, 1988, reflecting payments of $4,250.00 which exceeded the amounts due on seven matching invoices and bore notations such as "old balance" and "on account").

Caruso was uncertain about whether the Debtor had been sued by Jefferson pre-petition and indicated that a suit may have occurred while he was at the Duke Medical Center. On cross-examination, however, Caruso identified a letter with an attached Stipulation dated June 1, 1988, which settled litigation pending in the District Court commenced by Jefferson against the Debtor. The Stipulation provided for payment by the Debtor to Jefferson of $60,257.45 at nine percent interest in minimal monthly installments of $1,500.00. *See* Debtor's Exhibit 4 (copy of letter from Robert O. Wilhelm, Esq., to the Clerk of the District Court (June 1, 1988), which attached Stipulation of Settlement signed by Wilhelm, Pratt and Caruso (June 1, 1988)). *See also* Debtor's Exhibit 3 (copies of summons and complaint (Apr. 1, 1988) and acknowledgement of service on Secretary of State, New York State (Apr. 5, 1988) in *Jefferson Cheese Mfg., Inc. v. Sal Caruso Cheese, Inc.*).

Said Stipulation was listed in the Debtor's Statement at item eleven, and Jefferson, originally appearing in Schedule A-2 as the holder of a claim for $58,007.51 secured by Caruso's personal guaranty, was subsequently relocated to Schedule A-3 to reflect its unsecured status in an amendment filed on October 4, 1988. *See* Movant's Exhibit A.

Caruso acknowledged that the Debtor had made no effort to date to recover any preferential payment made to Jefferson and that he was personally obligated for Debtor's outstanding obligation to Jefferson.

On direct examination Caruso also indicated that prior to filing, the Debtor had owed approximately $60,000.00 to Falbo. Schedule A-3 lists Falbo as the holder of an unsecured claim in the amount of $33,579.10, as well as lists an unsecured claim of $7,525.13 to Falbo Pizza Crusts/Pizza Crust Co. of Pa., Inc., with a different street address in Carbondale, Pennsylvania. *See id.* Neither entity filed proofs of claim. Caruso acknowledged a payment by Debtor to Falbo on April 15, 1988 of $12,000.00 "on account" but was unclear on whether the payment was made on a past due account, since he was at Duke Medical Center on that date. *See* Movant's Exhibit F (copies of invoices and checks from Dec. 11, 1987 through Apr. 18, 1988).

Falbo entered into an agreement with the Debtor after the August 1988 fire and, without Court authorization, to continue marketing Falbo cheese products under the Debtor's name in the Syracuse, New York area. Caruso testified that Falbo was sim-

ply utilizing packaging material previously purchased from the Debtor and although the Debtor was receiving no consideration from Falbo for the use of its labels, the arrangement was keeping Debtor's name active in the Syracuse market. Caruso acknowledged that prior to the fire, the Debtor was receiving forty cents per pound for all cheese Falbo sold under its label in the Syracuse area.

Caruso further acknowledged that the Debtor also transferred a "multivac" cheese packer to Falbo prior to the date of filing, in the early part of 1988, without receiving any monetary consideration. He testified that he presumed "Falbo could take money off the bill" in return for the transfer. Caruso could not recall how much of a credit was taken against Falbo's bill in return for the cheese packer.

Frank Aceto, III ("Aceto"), a former employee of the Debtor, testified on direct examination by the UST that while employed as a warehouse dispatcher, he supervised the transfer of a cheese cooker, cheese molder and a cheese packer to Falbo in late April or early May 1988 at Caruso's request. Caruso conceded that there was no reference to these transfers in response to Question fourteen of the Debtor's Statement. *See* Movant's Exhibit A. Aceto also testified that, with the exception of two items, all of the equipment had been moved out of the Debtor's plant prior to the fire, including a piece of equipment in which he had an indirect interest. *But see* Movant's Exhibit E (Part E, two page list of 514 pieces of equipment and machinery damaged or destroyed in fire). Aceto stated that his attorney had recently received a letter indicating that that item of equipment had also been lost in the fire.

Caruso identified a 1988 Ford truck purchased by Debtor in June 1988, but presently in the possession of "Dino's Sausage," pursuant to an unauthorized postpetition agreement whereby Dino's took over the truck payments due and owing Marine Midland Bank. Dino's Sausage & Meat Co., Inc. was listed in Schedule A-3 as holding an unsecured claim for $741.93 while the amendments filed on October 4, 1988 added Marine Midland Bank, N.A.'s claim of $8,083.00 secured by a 1988 Chevrolet truck valued at $15,280.00 to Schedule A-2. *See id.* The Debtor's subsequently filed Amended Disclosure Statement stated that Dino's Sausage had offered $15,000.00 for the 1988 Chevrolet truck, and attached a "bid." *See* Movant's Exhibit D at 4. Court authorization to conduct this sale, as well as the sale of a 1984 Chevrolet truck for $800.00, was granted in an Order entered June 5, 1989.

During July of 1988, Caruso acknowledged that the Debtor transferred a substantial amount of "production" equipment to Monroe, a West Virginia company, at an agreed price of $10,000.00, almost all of which was identified as an existing asset of the Debtor in an appraisal attached to the Amended Disclosure Statement. *Compare* Movant's Exhibit L (copy of list of thirty-one pieces of equipment on Debtor's stationery bearing notation of "Received Bill W. Wicklin, Cheese of Monroe, Paid S. Caruso 7/22/88") *with* Movant's Exhibit D at 4 (Copy of list of twenty-six pieces of equipment, dated Nov. 9, 1988). Caruso testified that he only intended to sell some of the Debtor's equipment to Monroe for $10,000.00 since it had an appraised value of $16,650.00, but that he had not been at Debtor's place of business when someone named "Bill" from Monroe showed up to take delivery.

Testifying on direct examination by the UST, William Guy ("Guy"), Monroe's president, indicated that he had contacted Caruso in mid-July concerning the purchase of the equipment and had travelled to Utica with others on July 16, 1988 to complete the sale. Guy testified that he believed that a mozzarella cooker was to be included in the equipment but it was not there and, thus, a reduced purchase price of $10,000.00 was agreed upon with Caruso. Guy also was directed by Caruso to deliver a cashier's check in the sum of $10,000.00 payable to his wife, Mrs. Caruso, as she owned the equipment.

On July 22, 1988, Monroe sent four trucks to Utica to pick up the equipment. Guy testified that Caruso was not at Debt-

or's plant on that date but Mrs. Caruso was present and requested that two checks of $5,000.00 each be made payable to Caruso, as he owned the equipment. *See* Movant's Exhibit K (two checks dated July 22, 1988, each made out to Sal Caruso and signed by Bill W. Wickline). Guy explained that the checks were drawn pursuant to her instructions on the personal account of "Bill Wickline" as Monroe had not yet established a bank account.

Shortly after issuing the checks and transporting the equipment back to West Virginia, Guy alleged that Monroe was advised by a "route driver" that the Debtor had filed bankruptcy. He then called Mrs. Caruso to verify the filing and to advise her that they were stopping payment on the two checks. Mrs. Caruso denied the filing and told Guy to call Pratt, the Debtor's attorney. Pratt acknowledged the Debtor's filing to Guy on the telephone and advised him that he would clear the matter up.

Later, Guy testified, Pratt contacted him and told him that the purchase price was $16,650.00, not $10,000.00, and that if the balance wasn't paid, Pratt would ask the Bankruptcy Court to order the return of the equipment. Guy also related a telephone call from Caruso at the end of July 1988 in which Caruso admonished Guy for causing a problem with the sale and indicated that the sale was none of his (Caruso's) wife's business.

On cross-examination, Guy acknowledged the advice of his counsel—that the equipment sale required court approval—but denied that Pratt gave him similar advice. Guy testified that as of the date of the hearing, Monroe still desired to complete the purchase of the equipment. As of the hearing, Debtor had not applied to the Court for an order approving the sale of the equipment in the possession of Monroe. However, a sale of the twenty-six pieces of equipment to Monroe was approved *nunc pro tunc* by Order entered May 31, 1989.

On direct examination by the UST, Dale Salerno ("Salerno"), Debtor's bookkeeper since 1981, identified four checks, numbered 14204 through 14207, that were drawn on Debtor's account and dated between June 15th and June 24, 1988 in the sum of $5,000.00 each, payable to Mrs. Caruso. Three of these four checks were dated prior to other checks with lower numbers and Salerno could not recall if she had been asked by Mrs. Caruso to back date them. *See* Movant's Exhibit M (copies of checks 14204, 14205, 14206, 14207); Movant's Exhibit N (copy of Debtor's check register).

Salerno denied any knowledge of crediting the Falbo account for equipment transferred by Debtor to Falbo. She reaffirmed that no payroll taxes were withheld from the $250.00 per week paid to Caruso but could not recall that sum being treated as a repayment of any loans made by Caruso to the Debtor.

On cross-examination, Salerno verified that she had actual knowledge of Mrs. Caruso personally paying Jefferson $16,000.00 or $17,000.00 in the spring of 1988 to insure its continued delivery of cheese. In support of Salerno's assertion, Debtor offered three checks dated 1/17, 4/21 and 6/13/88, drawn on Mrs. Caruso's personal account in the total sum of $20,076.95: two checks were made payable to "Sal Caruso Cheese" while the third was payable to "Cash" but bore the notation "For—Bank Ck for Caruso Cheese." *See* Debtor's Exhibit 10 (copies of three checks drawn on two accounts under the names of Desdemona Jones and Desdemona Jones Caruso). Mrs. Caruso stated that Jefferson required a bank check which was why she had made out the three checks to the Debtor or cash.

Mrs. Caruso, on direct examination by the UST, explained that she believed the four checks of $5,000.00 each were drawn on insufficient funds when she received them, but she had wanted to prove to Caruso that Debtor owed her $20,000.00 because it was a "husband-wife thing." She also thought that at least one of the checks might be good and denied knowledge of any banking regulation requiring the reporting to the Internal Revenue Service of disbursements of funds in excess of $10,000.00.

Mrs. Caruso denied any formal involvement in Debtor's business, indicating that for thirty years she had been a partner in a nursing home chain with capital assets of between four to five million dollars. She did acknowledge becoming involved in Debtor's business in the spring of 1988 while her husband was hospitalized at Duke Medical Center. She further indicated that the Debtor's business was experiencing cash flow and bookkeeping problems shortly after she stepped in and that Debtor's checks began to "bounce."

Mrs. Caruso admitted that she was aware of the Debtor's Chapter 11 filing in July when she received the $10,000.00 for the equipment sold to Monroe and for that reason she turned the checks over to Pratt who advised her that the equipment could not be sold absent a court order. She also recalled telling the people from West Virginia to make the checks out to "Sal" since in her mind Sal and Sal Caruso Cheese, Inc. are one and the same.

Mrs. Caruso instituted new procedures after she took over Debtor's operations in the spring of 1988 which prevented checks from being issued on insufficient funds and controlled the amount of inventory on hand. See Debtor's Exhibit 12 (bookkeeping worksheet from March 28 through August 6, 1988). She stated that these practices were continued upon her husband's return to the business.

Mrs. Caruso contradicted Aceto's testimony indicating that there was packing and shredding equipment on the Debtor's premises at the time of the fire. She also opined that the Debtor would need at least $5,000.00 to reopen the retail operation, and that she had those funds, but added that no steps have been taken to reopen because they have been waiting for the fire insurance money.

On cross-examination, Mrs. Caruso indicated a lack of family members to assist operating the Debtor's business in the future and believed that Debtor might have to hire an expert to run the business as she did to operate her nursing homes.

Finally, Mrs. Caruso identified a list of equipment, dated June 21, 1988, which was prepared by Caruso and reflected a value of $11,500.00, attached to a signed handwritten note indicating delivery to Falbo on the same date of equipment valued at $11,000.00. See Debtor's Exhibit 13 (list of 7 pieces of equipment on Debtor's letterhead with attached handwritten note). Mrs. Caruso agreed that she was not aware, however, of any credits taken against the Debtor's bill due and owing Falbo as a result of the transfer of equipment.

Debtor filed an Amended Disclosure Statement one week before the evidentiary hearing on the instant motion was commenced and its approval hearing has been adjourned pending the resolution herein. It summarized the Debtor's Plan of Reorganization, originally filed with its first Disclosure Statement on November 7, 1988. The Plan contemplates an effective date upon receipt of the fire insurance proceeds at which time all priority claims, consisting of professional fees and the Department of Labor settlement, would be paid in full. The Plan also proposes to pay secured creditors under the terms of their agreements or reaffirmation agreements after certain sales of real and personal property are conducted to reduce the claims, and contemplates full payment of allowed unsecured claims, without interest, over sixty months following the effective date of the Plan. See Movant's Exhibit D at 2.

Said Amended Disclosure Statement also indicated an expected decision from the Home Insurance Company on the Debtor's fire claim within sixty days, and if the payment was not acceptable, planned an "early suit." Id. at 5. The Plan contemplated a reactivation of the cheese business financed by the insurance proceeds, the profits of which would then service its debt, reduced by the sale of certain nonessential real and personal property.

The Amended Disclosure Statement also noted the completion of all discovery, save examinations before trial, in Moscahlades Bros., Inc. v. Sal Caruso Cheese, Inc., pending in Supreme Court, New York County, which arose out of nonpayment for cheese products, and characterized the entire lawsuit, including its own $200,000.00

counterclaim for loss of business and reputation damage, as difficult. *Id.* at 5.

To date, neither the Amended Disclosure Statement or Plan have been approved nor has the Debtor received fire insurance proceeds or appeared to have instituted a complaint against its insurer. One operating report, dated August 26, 1988, was filed on September 22, 1988 for the period July 1, 1988 through August 26, 1988, indicating total receipts and disbursements of $196,472.78 and $165,699.71, respectively, and a balance of $30,773.07 in an unidentified bank. *See* Movant's Exhibit B. Payments during the month of July included $14,698.70 to Jefferson, $19,895.45 to Falbo, $260.00 to Caruso for auto repair, as well as a $1,000.00 draw and $6,700.56 in "listed" payroll. *See id.* From August 1 to August 26, 1988, among the payments listed were $8,448.87 to Jefferson, $13,376.10 to Falbo, $72.50 to Caruso for auto expense and a $1,750.00 draw and $4,930.76 in "listed" payroll. *See id.*

In Interim Orders entered September 16, 1988, November 7, 1988 and February 1, 1989, the Debtor was restrained from using more than $2,000.00 per month from its pre-petition inventory and accounts receivable. These Orders resulted from Key Bank's motion pursuant to Code § 363 and a loan it had made to the Debtor in February 1988, originally made returnable August 29, 1988 and adjourned pending the resolution of the instant motion. The Interim Orders also directed the Debtor to pay to Key Bank a total of $70,000.00 and deposit all proceeds from pre- and post-petition accounts receivable and inventory into an interest-bearing, debtor-in-possession account at Norstar Bank of Upstate New York in Utica.

Key Bank was listed in Schedule A–2 as the holder of a claim of $128,930.88, secured by inventory and receivables. *See* Movant's Exhibit A. The Debtor's Amended Disclosure Statement indicated that Key Bank's claim had been reduced to $59,000.00 pursuant to the Interim Orders. *See* Movant's Exhibit D at 3–4.

## ARGUMENTS

In anticipation of an evidentiary hearing originally scheduled for September 28, 1988, the UST argued that the Debtor's failure to file timely and complete operating reports, its unauthorized use of Key Bank's cash collateral, and the increase in officer salaries post-petition, all point to the Debtor's breach of its fiduciary responsibilities as a debtor-in-possession and constitute "cause" under Code § 1112(b). The UST additionally relies upon Code § 1112(b)(1) by noting a) the inaccurate picture produced by the operating report, due to the exclusion of various expenses, and b) its two primary assets consisting of lawsuits, one stemming from the rejection of its insurance claim from a fire "determined to be arson" which destroyed most of its business premises and inventory on August 11, 1988 and terminated its business operations. *See* Memorandum Of Law In Support Of United States Trustee's Motion Pursuant To 11 U.S.C. Section 1112(b) To Convert Case To Chapter 7 Or Dismiss Case at p. 11 (rec'd & filed Sept. 21, 1988).[1]

In a supplemental memorandum of law filed on March 23, 1989 following the evidentiary hearing referred to herein, the UST notes the filing of additional financial data by the Debtor covering the period October 1, 1988 through November 30, 1988 but nothing for December 1988, January or February 1989. It also cites to Debtor's failure to disclose the pre-petition transfer of equipment to Falbo in its Statement or at the Code § 341 meeting of creditors. Finally, the UST refers to the unauthorized post-petition transfer of equipment outside the ordinary course of busi-

---

**1.** Of the five grounds contained in the UST's motion, filed August 18, 1988, four have largely been rendered moot by subsequent events in the case: 1) the December 20, 1988 entry of an Order approving the Debtor's settlement with the Department of Labor after a hearing on November 7, 1988 attended by the UST, 2) the scheduling of the "341" meeting on six different dates and times, as indicated on the docket sheet and generally referred to in the UST's supplemental memorandum of law, 3) the Debtor's filing of an operating report on September 22, 1988, and 4) the Debtor's filing of a Disclosure Statement and Plan of Reorganization on November 7, 1988 and an Amended Disclosure Statement on February 17, 1989.

ness to Monroe, followed by a representation in its Amended Disclosure Statement that the sale of this same equipment would presumably occur in the future, rather than acknowledging that the sale had already occurred some eight months earlier. The UST postures that these factors are sufficient to warrant conversion of this case to Chapter 7 so that a trustee may pursue the avoidance of both of these asset transfers.

In closing arguments, the UST had also pointed to 1) the agreement with "Dino's Sausage," again without court authorization, where Debtor gave the use of its truck in return for Dino's alleged assumption of payments to a secured creditor, 2) Debtor's failure to pursue obvious pre-petition preferences made to Falbo and Jefferson, 3) the filing of unsubstantiated claims by Caruso against the Debtor, and 4) the Debtor's inaction regarding its questionable fire insurance claim.

Conversely, Debtor argued that its preferential payments to Jefferson were necessary to keep Debtor's business afloat and that any payment to Mrs. Caruso on the eve of bankruptcy filing was simply intended to reimburse her for monies actually loaned to Debtor in 1988. Debtor also defended the agreement with "Dino's Sausage" as being in the ordinary course of its business and opined that an auction sale of Debtor's assets by a trustee would not generate any amount close to that which could be obtained by the Debtor in the Chapter 11 context.

The Debtor contended that it has complied with the directions by the UST and the Court as required by the Code and states that its creditors would not get paid in full in Chapter 7, as in the Chapter 11 case. The Debtor observed that no unsecured creditor appeared in opposition to its Disclosure Statement hearing and that the UST did not show that a Chapter 7 trustee would be better able than itself to collect and utilize the fire insurance proceeds.

While admitting that its business has been inoperative since the fire on August 12, 1988, the Debtor claims that the UST has also not met its burden on demonstrating that there is no reasonable likelihood of its ability to rehabilitate. It assures the Court that its insurance carrier will be responding to its claim shortly. The Debtor states that its "sole shareholder, through his wife, has offered to furnish funds necessary to reopen the retail business in the very near future, and such action, together with the clean-up of debris is certainly calculated to best preserve the value of assets available to take care of all legitimate property claims." See Answering Affidavit at para. 18 (Mar. 23, 1989).

Finally, Debtor points to the unsecured loans made by Caruso and his wife to continue its operation shortly before the filing, which it claims was precipitated by the Department of Labor dispute which it settled at a substantially reduced amount, as a hallmark of its good faith.

## DISCUSSION

■ Code § 1112(b) provides for the conversion or dismissal of a Chapter 11 proceeding, whichever is in the best interests of creditors and the estate, if cause is established. "Cause" is enumerated in ten non-exclusive categories, see Code § 102(3), and may also be established by the filing and maintaining of the Chapter 11 without good faith. See In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 985 (Bankr. N.D.N.Y.1988) (and cases cited therein); In re Dade Corp., 17 B.R. 887, 890–91 (Bankr. M.D.Fla.1982). The lack of good faith in maintaining the case must rest on the totality of circumstances, and involves finding an intent to abuse the judicial process and the purposes of the reorganization process, which may include the breach of a debtor's fiduciary duty. See In re Garsal Realty, Inc., 98 B.R. 140, 151–52 (Bankr.N.D.N.Y. 1989); In re Copy Crafters Quickprint, Inc., supra, 92 B.R. at 985; In re Telemark Management Co., Inc., 41 B.R. 501, 507 (Bankr.W.D.Wis.1984); Ward v. Guglielmo (In re Guglielmo), 30 B.R. 102, 109 (Bankr.M.D.La.1983); In re Paul Kovacs & Co., Inc., 16 B.R. 203, 205 (Bankr.D. Conn.1981).

■ The concept of the debtor-in-possession as a fiduciary of the estate, the creditors and the Court, stems from its assump-

tion of the rights and powers of a trustee and extends to a corporation's officer, director, shareholder or managing employee where the facts disclose control and/or management. *See Wolf v. Weinstein*, 372 U.S. 633, 649–53, 83 S.Ct. 969, 979–81, 10 L.Ed.2d 33 (1963); *Mosser v. Darrow*, 341 U.S. 267, 270, 71 S.Ct. 680, 681–82, 95 L.Ed. 927 (1951); *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939); *In re Martin Custom Made Tires Corp.*, 108 F.2d 172, 173 (2d Cir.1939). *Accord In re Grinstead*, 75 B.R. 2, 3 (Bankr. D.Minn.1985) (plan confirmation terminates debtor-in-possession status, the estate and the former's obligation to act as a fiduciary of the latter). As a fiduciary, the debtor is obligated to protect and conserve property in its possession, as well as to provide voluntary and honest disclosure of financial information—a reasonable *"quid pro quo"* for its temporary relief from substantial financial obligations. *See In re Photo Promotion Ass., Inc.*, 72 B.R. 606, 611 (Bankr. S.D.N.Y.1987), *citing to Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 754 (9th Cir.1985) *and Northwestern National Bank of St. Paul v. Halux, Inc. (In re Halux, Inc.)*, 665 F.2d 213, 216 (8th Cir.1981); *Travelers Insurance Co. v. Plaza Family Partnership (In re Plaza Family Partnership)*, 95 B.R. 166, 172 (E.D.Cal.1989); *In re Valley Park Group, Inc.*, 96 B.R. 16, 23 (Bankr.N.D.N.Y.1989); *Paccar Financial Corp. v. Pappas (In re Pappas)*, 17 B.R. 662, 667 (Bankr.D.Mass.1982).

The bankruptcy court has wide discretion to determine if cause exists and how to ultimately dispose of the case. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 117–18, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5787, 5903–04; H.R.Rep. No. 595, 95th Cong. 1st Sess. 405–06, *reprinted in*, 1978 U.S.CODE CONG. & ADMIN. NEWS 5963, 6361–62. *See also Koerner v. Colonial Bank (In re Koerner)*, 800 F.2d 1358, 1367 (5th Cir.1986); *In re Crosby*, 93 B.R. 798, 801 (Bankr.S.D.Ga.1988); *In re Ledges Apartments*, 58 B.R. 84, 87, 88 (Bankr.D.Vt.1986). Conversion or dismissal of a Chapter 11 case is a drastic measure and the burden is on the movant to prove it is warranted and not premature. *See id.* at 87 (citations omitted); *In re McDermott*, 78 B.R. 646, 651 (Bankr.N.D. N.Y.1985).

█ The Court has carefully examined the trial record, including the candor, demeanor and testimony of the five witnesses and the twenty-three exhibits received into evidence, the memoranda submitted by both of the parties herein, and taken judicial notice, as indicated, of the bankruptcy case record. The record evinces a parade of episodes between the Debtor, its insiders and counsel and Jefferson, Monroe, Falbo and Dino's Sausage that appear to have been carried out in direct violation of Code §§ 363, 541, 547, 548, 549, and 1107(a), notwithstanding the subsequent "curing" of the transfers to Monroe and Dino's Sausage upon the entry of *nunc pro tunc* Orders. *See, e.g., Cedar Tide Corp. v. Chandler's Cove Inn, Ltd. (In re Cedar Tide Corp.)*, 859 F.2d 1127, 1133 (2d Cir. 1988), *appeal pending.*

For example, it would appear that the Debtor listed several pieces of equipment in its proof of fire loss that it sold to Monroe two weeks prior to the fire. Additionally, the Amended Disclosure Statement filed February 17, 1989 represented its current ownership of all the equipment sold to Monroe at the end of July 1988 and then authorized by the Court *nunc pro tunc.* No such order was entered with respect to the transfer of equipment to Falbo on June 21, 1988, as conceded by Mrs. Caruso and confirmed by Aceto's convincing testimony. Plus, the pre and postpetition payments to Falbo and Jefferson appear to have been made within ninety days of the filing and still remain to be recovered by the estate, even though stopped by Key Bank's Interim Order. Moreover, the petition and schedules evidence a host of inconsistencies such as the transfer to Dino's Sausage of a vehicle not listed in Schedule B–2, the incorrect exercise of exemptions, the lumping of four parcels of real property with one market value in Schedule B–1 and another parcel—1010 Tilden Avenue—listed as collateral for the City's loan in Schedule A–2 with the

same market value and yet not listed in the prior schedule. These discrepancies, when added to the negative responses in the Statement, cast doubt on all of the Debtor's disclosures and severely compromise its ability to act with integrity within the context of its Chapter 11.

The Debtor's obligation to file "periodic reports and summaries of the operation of its business" pursuant to Code § 704(8) as made applicable through Code §§ 1106(a) and 1107(a) and Bankr.R. 2015(a)(3) and X–1007(b) remains in force, even given the cessation of its business because of the August 11, 1988 fire. The Order Directing Duties Of Debtor In Possession entered July 6, 1988 has not been vacated or amended and the collection of accounts receivable and $2,000.00 monthly disbursements, including payments to Caruso, presumably continues and must be reported and monitored. *See* Movant's Exhibit (showing post-petition activity in pre-petition account); Movant's Exhibit B (operating report from July 1, 1988 through August 26, 1988).

Thus, even charitably characterizing the aforementioned activities with Jefferson, Monroe, Falbo and Dino's Sausage and Caruso, and Mrs. Caruso as "shenanigans," the Court is more than convinced that this case should be converted to a Chapter 7 proceeding so that an independent trustee can objectively determine the affairs of the estate and begin to maximize its value for the benefit of Debtor's creditors. *See In re Copy Crafters Quick Print Inc., supra,* 92 B.R. at 973. That this was a task that the Code requires of debtors-in-possession as well, including the Debtor here, has apparently escaped the attention of the Debtor throughout the almost thirteen months of this Chapter 11 proceeding. *See* Code §§ 1107, 1108.

The record reveals an absolute disregard of the strictures of the Bankruptcy Code or at best a calculated strategy of selective compliance. Indeed, the Debtor's post-petition compliance with the Code appeared to be an afterthought triggered by the UST's actions herein, and demonstrates that it had to be ordered to do those things re-

quired by statute. The Court would note that the one operating report on file is misleading and incomplete. For ,instance, it indicates draws to Caruso in excess of what he testified he received and inconsistent with his compensation historically, exclusive of money for auto expenses, as well as additional payroll expenses that appear questionable in light of the depressed state of the Debtor's business post-petition in July and the fire on or about August 11, 1988, which reduced its employees to one— Caruso.

This Court does not believe that a debtor should be coddled into complying with the Code and then congratulated upon each instance of substantial compliance. The Debtor's role as a fiduciary is a self-executing one. The Court finds cause in the Debtor's breach of its fiduciary obligation to the creditors and the estate that no amount of *nunc pro tunc* orders can rectify.

Chapter 11 is not a game to be used for sport against creditors for the benefit of insiders. It is part of Title 11's intricate statutory scheme, enacted by Congress under the authority of Article I of the Constitution of the United States, to provide entities in financial distress with the breathing room to get back on their feet while simultaneously protecting the rights of those entities, generally speaking the creditors, unfortunate enough to have become involved with a debtor. *See generally* M. Bienenstock, BANKRUPTCY REORGANIZATION 2–4 (1987) (discussing "Equity Policy" and "Reorganization Policy"). It functions as a shield, in exchange for certain sacrifices, such as honest and continued public disclosure, and is never to be used as a sword. Chapter 11 relies upon informed negotiation largely through the debtor's duty as a fiduciary of the estate and the creditors. *See In re Denrose Diamond,* 49 B.R. 754, 759 (Bankr.S.D.N.Y. 1985). Any lapse in that obligation would severely impair the Chapter 11 process, which is thus policed by Code § 1112(b). *Accord United Savings Ass'n. Of Texas v. Timbers Of Inwood Forest Ass., Ltd. (In re Timbers Of Inwood Forest, Ass., Ltd.),* 808 F.2d 363, 370–72 (5th Cir.1987) (panel

en banc reinstating 793 F.2d 1380 (1986)), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

While the Court is inclined to be lenient with a witness' occasional lapses of memory, it cannot be so generous with Caruso, who repeatedly gave ambivalent answers to critical questions and seemed to have no grasp of the business he operated as its sole officer and shareholder. The Court realizes that Caruso was apparently very ill in the months prior to the filing and understands that a bankruptcy filing is almost always attended by financial chaos and a certain degree of mismanagement. However, the Court finds the Debtor's questionable pre and post-petition conduct, as committed through its sole officer and shareholder, to so taint Caruso's demeanor and evasive responses as to render his testimony wholly unconvincing, especially when compared to the testimony and demeanor of Guy and Aceto.

Likewise, the Court finds less than credible the testimony of the Debtor's other insider, Mrs. Caruso. It does not ring true for a woman who is independently engaged in a business requiring a certain degree of financial acumen, and who possessed sufficient management ability to implement new procedures during the time her husband was at Duke, to claim ignorance of basic banking, sale and title procedures. Nor is the Court persuaded that she had only a passing interest in the Debtor necessitated by her husband's absence. Caruso testified that he returned from Duke prior to the filing and yet it was Mrs. Caruso who met the people from Monroe on July 22, 1988 and who, as relayed by Salerno's testimony, appeared to have ready access to the Debtor's books up to the date of filing, knowledge of its precarious financial situation, and the apparent urgency of paying Jefferson.

The insider status of Caruso and Mrs. Caruso, Code § 101(30)(B)(i, ii, iii, vi), (39), subjects all their transactions with the Debtor, including the alleged loans, to a greater scrutiny than "arms length" transactions. *See In re Athos Steel and Aluminum, Inc.,* 69 B.R. 515, 521 (Bankr.E.D. Pa.1987) *cited in In re Crouse Group, Inc.,* 75 B.R. 553, 557–58 (Bankr.E.D.Pa. 1987) (quoting *Wolf v. Weinstein, supra,* 372 U.S. at 649, 83 S.Ct. at 979). *See, e.g.,* Code § 547(b)(4)(B); *Levy v. Runnells (In re Landbank Equity Corp.),* 83 B.R. 362 (E.D.Va.1987); *Chittenden Trust Co. v. Sebert Lumber Co., Inc. (In re Vermont Toy Works, Inc.),* 82 B.R. 258 (Bankr.D:Vt. 1987). Indeed, the record suggests an alter ego relationship between the Debtor and the Carusos, as in its attempt to defend its good faith by pointing to their loans and their corresponding treatment of corporate assets, like vehicles and cash, as their own. While the Court is cognizant that this pattern of behavior often characterizes many closely-held corporations, the imposition of the bankruptcy filing forbids any semblance of activity approaching self-dealing among the debtor's representatives and creates a new and separate entity, the estate, *see* Code § 541(a), to which new obligations are owed. *See id.* 300–09.

Moreover, assuming arguendo the *bona fides* of their loans to the Debtor, a question not presently before the Court, equitable subordination pursuant to Code § 510(c) is certainly a possibility should certain facts be established. *See, e.g., McChesney v. Owoc (In re Shelter Enterprises, Inc.),* 98 B.R. 224, 230–32 (Bankr.W. D.Pa.1989); *In re Vermont Toy Works, Inc., supra,* 82 B.R. at 331–33. It is not likely that Caruso would cause the Debtor to scrutinize such matters against him. *Id.* at 304.

The Court would again stress that Chapter 11 is not a free-for-all for debtors and their insiders to carry on with impunity and without accountability. Were this Debtor to have exercised good faith and an honesty of intention in its pre and post-filing conduct, the Court presumably would have been willing to allow it to pursue its Chapter 11 reorganization although that reorganization is claimed to be wholly dependent upon a monetary recovery which may never occur.

However, the Debtor is not entitled to that vote of confidence because its activity has been in direct violation of the Code and

it has apparently done nothing with its cheese business since the fire but collect its accounts receivable and segregate them for Key Bank's benefit. Prudent business sense would perhaps have dictated an effort to revitalize the retail business at an alternate location or at least explore the possibilities of doing so. "The cessation of business, as evidenced by an absence of inventory, employees, equipment and/or income, makes unlikely the ability to rehabilitate." *In re Denrose Diamond, supra,* 49 B.R. at 757 (citations omitted). The record unequivocally discloses that the Debtor is "sitting tight," with the benefit of the automatic stay until, as indicated, its fire insurance claim is honored and, additionally, does not indicate a suit against the Home Insurance Company. This is no "viable corporation, with a place of business [at which the debtor] continues to conduct business on a gradually increasing scale." *In re National Safe Center, Inc.,* 54 B.R. 239, 241 (Bankr.D.Hawaii 1985). While the insurer's decision is admittedly not an event within its control, the Court is not convinced that there has been a bona fide attempt or intent at rehabilitation.

Mrs. Caruso testified that it would take at least $5,000.00 to reopen the retail store and that she had the funds. Furthermore, the petition, schedules and the one operating report indicated the presence of funds for such expenditures. Yet no movement has been made towards that end. Thus, this financial wherewithal indicates the Debtor's ability to operate, while severely blunted by the fire, and suggests that its termination was not solely because of the fire and rests on other undisclosed factors.

The apparent unwillingness to begin the process of reviving its business—from capitalizing on its assets, such as "packaging," trademark and good-will, used by Falbo post-petition without consideration, to recapturing preferential transfers of money and property, to actively setting up shop in another location—is further evidence of the "absence of a reasonable likelihood of rehabilitation," notwithstanding the questiona-

ble fire insurance claim.[2] "There is no assurance that this debtor could make a phoenix-like emergence from its ashes even if it were to succeed in its claim against the insurance company." *D & F Meat Corp.,* 68 B.R. 39, 41 (Bankr.S.D.N.Y.1986).

It is also clear that the fire, as well as any post-petition transfers still unauthorized, and the pre-petition transfers, which would appear to stand a good chance of being avoided, are contributing to "a continuing loss or diminution of the estate." Furthermore, the absence of a significant loss is because "there is no operation or any business." *In re Tracey Service, Co., Inc.,* 17 B.R. 405, 409 (Bankr.E.D.Pa.1982). *See also In re CCN Realty Corp.,* 23 B.R. 261, 262–63 (Bankr.S.D.N.Y.1982). Hence, cause under Code § 1112(b)(1) has been established.

A cursory review of the Plan, indicates that it is unrealistic in terms of implementation in setting a starting date geared to the receipt of the fire insurance proceeds which is, as indicated, a nebulous exercise in speculation. Moreover, no amended plan of reorganization was filed with the Amended Disclosure Statement on February 17, 1989 to reflect subsequent events that have transpired since the November 7, 1988 date of the Plan or to provide alternative and concrete financing plans. Thus, the Debtor has exhibited "an inability to effectuate a plan" within the meaning of Code § 1112(b)(2).

The thirteen month lapse since the filing invokes Code § 1112(b)(3)—"unreasonable delay by the debtor that is prejudicial to creditors"—although the apathy of the majority of the creditor body in this bankruptcy proceeding, including two creditors holding secured claims, would seem to indicate otherwise. It is true that the claims of Key Bank and the City, the two largest secured creditors, have been approximately cut in half by post-petition payments authorized by the Court. The silence of Jefferson and Falbo leads the Court to uneasily

---

**2.** The record does not support, and the Court does not make a finding, as to whether or not the fire was determined to be arson, as set forth

in the UST's initial memorandum of law at page 11.

question whether or not they too have "been taken care of" although there are no corresponding Orders.

However, these four creditors only account for approximately forty percent of the total debt listed by the Debtor in its petition and the Court would note that Key Bank has joined in the motion. The Court does not find controlling the inactive posture of the unsecureds since it is unfortunately a constant in most bankruptcies and their protection is within the purview of the UST's role. The Court concludes that there has been unreasonable delay on the Debtor's part, with no end in sight, which has been prejudicial to the creditors.

As the record does not indicate otherwise, the Court assumes that the UST fees remain unpaid and that Code § 1112(b)(10) is still relevant.

The Court would note that each event described herein standing alone would probably not establish an entitlement in this court of equity to the relief requested by the UST. However, the sum total of all these events and transgressions creates a congery of cause within the meaning of Code § 1112(b), sealed by the questionable testimony of the Debtor's two insiders. The weight of this cause cannot be deflected by the "good faith" of the insiders in allegedly making approximately $200,000.00 of unsecured loans to the Debtor before the filing to keep the business running or the pro forma settlement of a priority claim.

The record thus demonstrates that the UST has met its burden of proof since it discloses behavior on the part of the Debtor and its insiders that contradicts the letter and the spirit of Chapter 11, as well as contemplates a rehabilitation that is unrealistic. *See In re McDermott, supra,* 78 B.R. at 651. To deny the UST's requested relief would be a miscarriage of justice and equity. "The purpose of § 1112(b) is not to test a debtor's good faith; it is to provide relief where the debtor's efforts, however heroic, have proven inadequate to the task of reorganizing his affairs within a reasonable amount of time." *A. Illum Hansen, Inc. v. Tiana Queen Motel, Inc. (In re Tiana Queen Motel, Inc.),* 749 F.2d 146, 152 (2d Cir.1984), *cert. denied,* 471 U.S. 1138, 105 S.Ct. 2681, 86 L.Ed.2d 699 (1985).

The Court finds conversion, rather than dismissal, to be in the best interests of the creditors and the estate because judicial and administrative oversight is essential to stem any further dissipation of assets by self-interested insiders to the further detriment of both entities. The appointment of an independent and disinterested trustee upon conversion would thus ensure the prompt liquidation of the assets, including the objective pursuit of pre and post-petition transfers, pending claims and the remaining real and personal property.

Accordingly, the Court grants the UST's motion to convert and denies its motion to dismiss based upon Code § 1112(b).

IT IS SO ORDERED.