## In re EAST COAST AIRWAYS, LTD., Debtor.

**Bankruptcy No. 089–90418–21.**

United States Bankruptcy Court, E.D. New York.

Sept. 30, 1992.

---

C. Steven Hackeling, Macco, Hackeling, Stern & Christensen, Huntington, N.Y., I. Leonard Feigenbaum, Special Counsel, Melville, N.Y., for debtor.

James J. Von Oiste, Port Jefferson, N.Y., for Beechcraft.

State of N.Y. Office of Atty. Gen. Robert Abrams, Barrie Goldstein, and David Cook, New York City, for DOT.

Scott Stuart, Garden City, N.Y., U.S. Trustee.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Before the Court is a motion to convert this three year old Chapter 11 proceeding to Chapter 7. The motion is made by the New York State Department of Transportation ("DOT"). The motion is made pursuant to 11 U.S.C. § 1112(b). The grounds recited in the motion are: (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation because the debtor is insolvent, not operating and is not economically viable; (2) an inability to effectuate a plan since the debtor has not filed a plan of reorganization; (3) an unreasonable delay by the debtor that is prejudicial to creditors. DOT's motion is supported by Beechcraft East, Inc. ("Beechcraft") and by the New York State Department of Taxation & Finance. It is opposed by the Debtor, which is not, however, opposing dismissal of the proceeding. The United States Trustee takes no position on the motion.

The Debtor, East Coast Airways, Ltd. (the "Debtor" or "East Coast") voluntarily filed under Chapter 11 on April 7, 1989. No creditors committee has ever been appointed. Although the Debtor tried in 1991 to have a bar order imposed on the filing of claims, it is doubtful that it succeeded.

DOT has filed a claim for over $300,000, making it the Debtor's largest creditor. Since 1985 East Coast has been litigating with DOT with respect to the money DOT claims East Coast owes it. That litigation, which started in the Supreme Court of the State of New York, is still going on in this Court. Michael Peragine, who controls East Coast and who either owns all, or a majority of, its stock, has acknowledged that East Coast's only current activity is its litigation with DOT which is also being pursued before the Federal Aviation Administration ("FAA"). East Coast and Peragine have filed a complaint with that body, alleging discriminatory treatment by DOT.

On August 27, 1991, East Coast filed a plan of reorganization under which it proposes to use $100,000 (or $120,000) to be contributed by Peragine to pay all undisputed creditors. Nothing is to be paid DOT. The Debtor has twice amended the proposed disclosure statement to accompany its plan, most recently on April 21, 1992. The hearing on approval of East Coast's disclosure statement, objection having been taken to earlier versions by DOT and other creditors, has been indefinitely adjourned pending disposition of this motion to convert.

The Findings of Fact which follow are based on the testimony elicited at the hearings on this motion, on the statements and exhibits submitted by the parties, and on the records of this Court, including the schedules filed by the Debtor, and, at the request of the parties the record in the adversary proceeding brought by East Coast against Beechcraft and DOT.[1]

## FINDINGS OF FACT

East Coast Airways, Ltd., the Debtor, is a New York corporation incorporated under the laws of the State of New York in November 1978. It is owned by Michael Peragine, although I. Leonard Feigenbaum, Special Counsel to the Debtor, may have a small stock interest. It is one of three corporations (there may be more) owned or controlled by Mr. Peragine and engaged in aviation related activities. The other corporations are Montauk–Caribbean Airlines, d/b/a Long Island Airlines ("LIA") and Long Island Aviation Center, Ltd. ("Aviation Center").

LIA filed for relief under Chapter 11 on the same date as the Debtor. On March 18, 1989, LIA and East Coast moved for an order directing joint administration of their Chapter 11 proceedings. The motion to administer the two cases jointly represented that both companies operated out of the same facilities and that their "facilities, staff and services ... are cross utilized to the extent that separation would be managerially and fiscally impossible to accomplish." The motion was withdrawn on June 16, 1989. One year later, LIA sold, for over one million dollars, certain rights which it enjoyed at LaGuardia Airport. After the sale was approved by this Court, LIA was permitted to withdraw its petition on the condition that it pay in full all filed claims. LIA's Chapter 11 case was closed January 8, 1992.

In 1980, East Coast negotiated for, and was given, a sublicense by Beechcraft on a portion of the premises at Republic Airport in Farmingdale, New York, which Beechcraft leased from the Metropolitan Transportation Authority ("MTA"). (Adv.Ex. 7). In 1982, ownership of Republic Airport was transferred from MTA to DOT which assumed all the rights and obligations of the MTA pursuant to New York State Trans-

---

1. The Court agreed to take judicial notice of the complaint, the answer and all the affidavits and affirmations filed in the adversary proceeding. (Tr., 8/28/91, p. 65). In that proceeding, East Coast has submitted two volumes of exhibits in support of its motion for summary judgment:

"Exhibits on Plaintiff's Motion for Summary Judgment" dated July, 1991 and "Additional Exhibits on Plaintiff's Motion for Summary Judgment" dated August, 1991, which are referred to herein as "Adv. Ex."

portation Law Section 400. DOT contracted with Lockheed Air Terminal, Inc. ("LAT") to manage the Airport.

Beechcraft under its contract was given the power to function through sublicensees. Paragraph 4 of its License Agreement read: "Licensee shall have the right, subject to the prior written approval of the MTA in each instance and subject to all of the terms and provisions hereof, to cause any one or more of the activities required or permitted to be performed by Licensee hereunder to be conducted by a sublicensee, who in the reasonable judgment of MTA, is competent to provide such services or perform such functions with a high degree of skill and competence, provided that Licensee shall not thereby be relieved any of its obligations or liabilities hereunder."

Paragraph 30 of Beechcraft's License negated any third party rights in its terms, providing "No third party is intended to be benefitted by the provisions of this Agreement, and only the parties hereto may enforce any rights created hereunder."

Beechcraft occupies the status of a fixed base operator ("FBO") at Republic Airport which carries with it certain benefits. Beechcraft is one of only two FBO operators at Republic Airport; there was a third which went into bankruptcy in 1986 or earlier. (Adv.Exs. 28, 29).

Beechcraft's agreement committed it to pay five percent of its gross receipts, with certain exceptions, to its lessor, after its first year of operation. Taxes were one of the exceptions from gross receipts in calculating the five percent.

Beechcraft's Sublicense to East Coast required the approval of MTA. Even before it was given, East Coast, in expectation of its receipt, began work on renovating the premises which it ultimately was given the right to occupy. Under East Coast's agreement with Beechcraft, its rent for the original term of the Sublicense—thirty months—was excused in light of improvements of a value of $43,040 that East Coast committed itself to make. (Adv.Ex. 6).

The original term of the lease was for 30 months beginning March 1, 1980. However, an addendum to the Sublicense Agreement provided as follows:

Sublicensee shall have the option to extend the term for successive thirty (30) month periods as long as Sublicensee is not in default hereunder and as long as any license agreement or extension thereof covering the Premises between Beech and MTA is in effect ... Sublicensee shall notify Beech in writing at least ninety (90) days before the end of each thirty (30) month period if Sublicensee desires to exercise its option to extend. If Sublicensee does not exercise its option to extend one of the thirty (30) month periods, all options to extend for subsequent thirty (30) month periods shall terminate.

East Coast's Sublicense required certain monthly payments to Beechcraft. Paragraph 3 of the Sublicense entitled "Fees," read:

Sublicensee agrees to pay Beech sublicense fees as provided on Exhibit "B" attached hereto and made a part hereof. All payments shall be made in advance on the first day of each month to Beech or to such agents and at such places as Beech shall designate.

Exhibit B provides that Sublicensee was to pay to Beach for transmittal to MTA additional license fees as follows: (a) Five (5)% (percent) of Sublicensee's gross fees accruing during the term of this Sublicense and of each renewal term hereof, except that there shall be excluded from Sublicensee's gross receipts for the purposes of determining the additional license fee payable under this sublicense, all state, local, and federal sales, use and excise taxes. Excluded from gross receipts are all revenues generated from operations not taking place at Republic Airport.

On May 22, 1980, Frank S. Tarbell, Director of Aviation at MTA, wrote Beechcraft saying that the MTA Board has approved Beechcraft's Sublicense with East Coast dated March 21, 1980 provided that Paragraph 5(a) of Exhibit "B" was amended by adding the following sentence: "However, all revenues generated from air-

craft that are owned or leased by East Coast Airways and based at Republic Airport shall be subject to the 5% fee regardless of where income from said aircraft is generated." The letter asked the parties to signify their concurrence with these changes by signing the letter. The letter was signed by Beechcraft on May 22, 1980; and by East Coast the same day. (Adv.Ex. 8) The amendment has been referred to by the parties as the Tarbell Amendment.

Mr. Peragine maintains that he agreed to pay five percent on all revenues generated by East Coast only as a result of fraud and duress. The duress lay in the fact that had he not signed both the original document and the Tarbell Amendment he would have lost the entire investment he had made in the improvements at the Airport. The fraud and misrepresentation lay in the fact that an employee of Beechcraft and the Airport Manager for LAT told him that the provision for payment of five percent to MTA was absolute and non-negotiable, that MTA had a legal right to that provision and that a similar provision was in effect in every other lease or license of the airport, but that it was strictly for appearance sake and the actual system followed was to charge a fixed amount based on the aircraft utilized. (Adv.Ex. 5).

Certain provisions of East Coast's Sublicense are pertinent to the present motion. They are:

4. *Books and Records:* Beech or the Metropolitan Transportation Authority shall have the right to audit Sublicensee's books and records at any time during normal business hours for the purpose of determining or verifying Sublicensee's gross receipts.

5. *Alterations:* It is understood and agreed that no alterations, additions or improvements to the Premises shall be made by Sublicensee without first having the written consent of Beech ...

\* \* \* \* \* \*

8. *Abandonment:* Sublicensee shall not vacate or abandon the Premises at any time during the term without Beech's written consent.

\* \* \* \* \* \*

12. *Assignment or Subletting:* Sublicensee shall not have the right to assign this Sublicense or any interest therein, without Beech's written approval, and such approval shall not be unreasonably withheld, and Sublicensee shall not be relieved of liability for the rent and obligations herein without written consent from Beech. Sale, assignment or transfer of more than 50% of the stock of Sublicensee or other change of control shall be deemed an assignment.

For many years, operating under the Sublicense, East Coast was a successful company. During each of the years 1983 through 1986, its gross revenues exceeded $2 million. (Affidavit of Stephen Mendelsohn, Esq., dated June 6, 1991 and submitted in support of DOT's motion, hereinafter "DOT Aff.") (Exs. A, B).

The Republic Airport Operations Report for December 1985 showed that East Coast was the largest passenger operator at the airport having carried over 60 percent of the total passengers enplaned that month. (Letter of Mr. Feigenbaum to Republic Airport Commission, dated January 31, 1986, which is Ex. 17 to a copy of the complaint filed by East Coast with the Federal Aviation Administration, entitled "Complaint Filed for the Purposes of Seeking an Appropriate Order or Other Enforcement Action." (Referred to hereinafter as "FAA Complaint", admitted herein as Ex. 5)).

East Coast never paid anyone the five percent called for by its Sublicense Agreement, paying Beechcraft for transmittal to DOT only the flat fee that Peragine says had been represented to him to be the fee that would be acceptable.

In early 1985, DOT audited East Coast's books to determine how much was owed under the five percent proviso. East Coast says it requested a copy of this audit but was advised that it was not yet available although East Coast has reason to believe that it was completed in April or May 1985. (Adv.Exs. 12–18). The audit is not part of the record and it is unclear whether it was ever made available to East Coast.

East Coast claims that on May 27, 1985 it mailed Beechcraft a letter confirming its intent to exercise its option to renew its Sublicense Agreement for an additional thirty month term. Its second thirty month term expired September 30, 1985.

Beechcraft, which denies ever receiving this letter, notified DOT in late September 1985 that because of East Coast's failure to renew the Sublicense Agreement it had been terminated on September 30, 1985.

A letter to East Coast from LAT followed advising Peragine that neither East Coast nor LIA had a valid license to conduct commercial operations out of Republic Airport and requested that all such operations cease immediately. The letter also demanded payment of $300,000 under the Sublicense Agreement. (Adv.Ex. 19).

### The Adversary Proceeding

On December 1, 1985, East Coast sued Beechcraft, LAT and DOT in the Supreme Court of the State of New York, Suffolk County. The first cause of action against Beechcraft alone demands a "declaration that plaintiff has renewed its Sublicense Agreement which is valid and continuing." The second cause of action was against LAT alone and was discontinued prior to the time the adversary proceeding was transferred to this Court. The third and fourth causes of action are against the DOT. The third cause of action challenges the legality of the five percent override called for in the Sublicense Agreement. East Coast demands "a declaration that the Tarbell Amendment is void and unenforceable, that the percentage provision of the Sublicense Agreement is void and unenforceable and that plaintiff is not indebted to the DOT." The fourth cause of action claims that East Coast had been denied a facility to construct a fixed base operation in violation of 49 U.S.C.App. § 2210 and asks for a judgment directing LAT and DOT to make available to East Coast sufficient land on which to construct such an operation. No monetary recovery from DOT is requested, only equitable relief. (Adv.Ex. 1).

DOT counterclaimed for $311,470, representing the amount due on the override to that point in time and a declaration that East Coast is under a continuing obligation for the time period following December 31, 1984 to remit five percent of its commissionable revenues to DOT on a monthly basis. (Adv.Ex. 2).

During subsequent proceedings in the Supreme Court, Justice Goldstein held that the fourth cause of action against the DOT had to be dismissed in its entirety and the third cause of action, to the extent it was based upon 49 U.S.C.App. § 2201, et seq., likewise had to be dismissed because that statute does not create any private right of action. (Adv.Ex. 5).

However, in addition to granting DOT's motion for summary judgment in part, Justice Goldstein ruled "in the interest of maintaining the status quo, East Coast's motion for preliminary injunction is granted to the extent that, pending the determination of this matter, defendants are prohibited from interfering with the plaintiff's business and activities at Republic Airport and from denying plaintiff utilization of the terminal facility." This injunction was subsequently continued in effect by Justice Joseph J. Saladino.

Starting around 1984, East Coast had tried to become a fixed base operator at Republic Airport but DOT refused to make land available to it for that purpose. (FAA Complaint, Exs. 15–19). On May 12, 1986, the FAA advised East Coast that an airport which has received federal funds may not exclude a fixed based operator on the ground that there is not sufficient business at the airport. (FAA Complaint, Ex. 20).

In 1988, East Coast ceased all, or virtually all, its air carrier operations, transferring those operations to LIA. It also arranged to have its FAA Air Carrier Certificate reissued to LIA. (Tr., 7/30/91, pp. 29–33).

That same year, according to the schedules filed by East Coast, East Coast sold a plane to GFL Aerocraft, Ltd., two automobiles to East Coast Micro Systems and transferred $43,500 of inventory to an unnamed recipient in exchange for forgive-

ness of a similar amount of indebtedness. On January 1, 1989, it sold three aircraft to Aviation Center for $15,000.

On April 7, 1989 East Coast voluntarily filed under Chapter 11. In an affidavit of Peragine, accompanying the required Chapter 11 schedules, the Debtor represented that at the time of filing and since November 1978, it had been "engaged in aircraft charter management and flight operations." (Affidavit, April 7, 1989, Par. 7). It gave its main business location as 1300 New Highway, Farmingdale, New York. The affidavit stated that East Coast had been forced to seek the umbrella of the bankruptcy court because it could not pay its debts as they matured and the Internal Revenue Service had levied on its property just before it filed. *Id.*

According to Peragine's affidavit, it was "desirable for the debtor to continue in the operation of its business and to cease to operate for even a short period of time would cause irreparable harm to the Debtor and make any reorganization or liquidation proposed herein impossible for confirmation." He further represented that East Coast anticipated starting to make a profit in the first 30 days and expected its profit in that period of time to be $1,600.

The Debtor's schedules showed $76,000 in assets, including $3,000 cash, a 1982 Jeep, accounts receivable of the value of $40,000 and an account receivable due from Atlantic Express, itself in bankruptcy, of $30,000. According the schedules, East Coast owned no office equipment, no machinery, no inventory and no tangible personal property. Listed as an asset, but of unknown value, was its license for office and hangar space and operational authority at Republic Airport.

East Coast was given authority to retain Macco, Hackeling & Stern ("MH & S") as attorneys in the Chapter 11 proceeding and to retain Mr. Feigenbaum to represent it in the adversary proceeding with DOT and Beechcraft.[2] Mr. Feigenbaum's retention

order authorized payment of $200 per hour on proper application to the Court. MH & S's retention order stated that it intended to bill at an hourly rate of $195.

After East Coast filed under Chapter 11 the pending action in the Supreme Court against Beechcraft and DOT was removed to this Court. (Stipulation, dated July 17, 1989).

Although East Coast had ceased air carrier operations in 1988 it continued "Part 91" operations until the end of 1989. Peragine identified Part 91 operations as "flight school, flight instruction, sightseeing rides in aircraft." Such operations continued up until sometime in early 1990 when they, too, ceased. (Tr., 7/30/91, p. 59; Tr. 8/28/91, pp. 10–12).

Asked on November 26, 1991 what was the business of East Coast, Mr. Peragine gave the following testimony:

Q   And what is East Airways?

A   East Coast Airways is a New York Corporation doing business at Republic Airport.

Q   And what is its principal business?

A   At the moment?

Q   Yes, at the moment?

A   Its principal business is this lawsuit at the moment.

Q   Does it have any ongoing operations?

A   No.

Q   What year did it cease its ongoing operations?

A   It has ongoing operations to the extent it is involved in this lawsuit.

(Deposition 11/26/90 at 12; Tr. 7/30/91 at 31).

At some point in time one of Mr. Peragine's other companies moved into the space covered by East Coast sublease with Beechcraft. (Tr., 7/30/91, pp. 35–36). It is unclear whether the company which moved in is Aviation Center or LIA or both or whether one succeeded the other in the space. It is also unclear whether this took

---

**2.** In the application to the Court to approve Feigenbaum as special attorney, Feigenbaum was described as having a five percent stock interest in the Debtor. In the Debtor's most recent Disclosure Statement, Mr. Feigenbaum is said to own 17 percent. Nothing was said about his being a creditor, although the schedules list him as owed $1,000.00.

place before or after East Coast filed its Chapter 11 Petition.

The Debtor's Proposed Amended Disclosure Statement, filed April 21, 1992 (p. 3) acknowledges that East Coast has discontinued active operations and "subletted a portion of its space to an affiliate Long Island Aviation Center." Currently, the only evidence at Republic Airport of East Coast's presence is a faded sign on a post at the edge of the parking lot, reading "East Coast Airways." (Tr. 8/28/91, pp. 5–9; Debtor's Ex. 2).

During the pendency of the Chapter 11, some, or all, of East Coast's records were moved from Republic Airport to a building in Syosset owned by Peragine. No notice of this move was given the Bankruptcy Court which continues to show East Coast's address as 1300 New Highway, Farmingdale, New York. (Tr., 7/30/91, pp. 59–60).

The only compensation East Coast has received for the occupancy of its space is that the rent (but not the five percent override to DOT) was paid by whatever company was occupying the premises. When Mr. Peragine was asked whether the company paying the rent at Republic Airport was the Aviation Center, he responded:

> I think Long Island Aviation Center made rent payments. Long Island Aviation Center stopped operating a while back, though I don't know exactly when, but it really has been a case of over a period of time whoever had had the money made the payment.
> THE COURT: Whoever had money among what, four corporations?
> THE WITNESS: Whoever had the money of for—between—If East Coast had the money it made the payments. East Coast had made the recent payment.
> THE COURT: East Coast, Montauk, Long Island Aviation, whoever had the money. Who else was in this group?
> THE WITNESS: No, that's it, and—or me.

(Tr. 8/28/91, pp. 54–55)

East Coast never sought, nor received, the approval of either Beechcraft or of the Bankruptcy Court to sublet or assign its space at Republic Airport or to turn any of the space over to any of Peragine's companies. (Tr., 7/30/91, pp. 38–43).

East Coast last filed an operating report on September 5, 1989. The three operating reports it filed cover the period from April 7, 1989 through July 1989.

On September 4, 1990, the DOT responded in the adversary proceeding to interrogatories framed by East Coast respecting what aviation companies paid it five percent of the company's gross receipts for facilities at Republic Airport. It showed that after 1980, East Coast was the only non FBO entity obligated to pay five percent of its gross receipts for operating at Republic Airport.

On August 6, 1991, East Coast and Peragine filed a formal complaint with the FAA against DOT and Beechcraft, predicated on the five percent override included in its Sublicense and the denial to it of land on which to operate an FBO facility.

In connection with the complaint East Coast lodged with the FAA in 1991, two attorneys were retained, Professor Marty Schwartz and Leon Friedman, who did "months and months and months of research." (Tr., 8/28/91, pp. 23–24). Peragine also hired an accountant in anticipation of East Coast's being charged with a fraudulent conveyance. *Id.* No authority was obtained from this Court to retain Professor Schwartz or Leon Friedman or an accountant.

Peragine testified that he has been renovating the Republic Airport facility, doing a good deal of construction, wallpapering it and carpeting it. He says "We probably—I personally, again, have spent a pile of money." (Tr., 8/28/91, p. 48).

Respecting these renovations Mr. Peragine gave the following testimony:

> Q  Now you mentioned before, I believe, that you were renovating space at Republic Airport. Is that true?
> A  We've been doing renovations at our own space, yes.
> THE COURT: You've got to keep your voice up, I can't hear you.

A Yes, we've done renovations at our own space.

Q And who has financed these renovations?

A I have.

Q Meaning Mike Peragine?

A Yes.

Q Now who is this on behalf of? Who are you renovating for?

A We're renovating a facility.

Q For whom?

A Hopefully, for East Coast.

Q Is this a loan to East Coast or a gift?

A Everything that I do for East Coast at this point is, obviously, a gift if you want to characterize that it way.

(Tr., 8/28/91, p. 100)

In October 1990, DOT first moved to convert East Coast's Chapter 11 to Chapter 7 or to appoint an operating trustee. After East Coast objected to the motion on the ground, *inter alia*, of insufficient notice, the motion was voluntarily withdrawn without prejudice.

Shortly thereafter, East Coast took the first necessary steps for confirming a plan of reorganization. It submitted to the Court in late 1990 an order calling for a bar date of "February 1, 1990" for the submission of prepetition claims against the Debtor. "1990" was clearly a typographical error since February 1, 1990 was far in the past when the proposed order was submitted. The Court noted the error and corrected the error in the order it signed so that the bar date in the Court's Order is "February 1, 1991." However, East Coast failed to conform its papers and apparently published the order as originally submitted with the typographical error. Hence, the notice published in November 1990 sets the deadline for filing claims nine months earlier, or February 1st, 1990. The Bankruptcy Rules require 20 days notice of a bar date. Fed.R.Bankr.P. 2002(a). No such notice has ever been given.

On April 28, 1992, DOT filed a claim for $311,470 plus "an undetermined amount equal to 5 percent of each month of [East Coast's] commissionable revenues" from January 1985 to present, saying that it was confirming its informal proof of claim "the documentation of which is set forth in the Department's counterclaim and papers filed in the adversary proceeding No. 090–7004 commenced in this Court on January 19, 1990." No objection has been filed to DOT's claim.

In an application filed in support of a motion by the Debtor voluntarily to dismiss its Chapter 11 petition conditioned upon payment in full of all filed undisputed claims, the Debtor set out the claims which it did not dispute and those which it did. (The Debtor later withdrew the motion to dismiss.) The Debtor said its debt to the IRS was paid, that it owed New York State Department of Taxation up to $27,087.24 and had undisputed, unsecured debts totalling $12,854. Disputed claims, not counting the claim of DOT, added up to $137,135.11. (Debtor's Application to Dismiss, March 11, 1992). The Debtor has filed no objection to any of the claims which it describes as disputed.

On June 6, 1991, the DOT moved a second time to convert this Chapter 11 proceeding and this is the motion now pending before the Court. The hearing on this motion began on July 30, 1991 and continued on August 28, 1991. Testimony was received from Peragine, principal of the Debtor, and various exhibits were put in evidence by the DOT, including a deposition taken earlier of Peragine.

While the hearings were in adjournment, the Debtor, in August 1991, filed a plan of reorganization and disclosure statement. Objections to both were filed by the United States Trustee, the United States Attorney and the DOT. An amended disclosure statement was filed on April 21, 1992 and still a second amended disclosure statement was filed on May 29, 1992. Hearings on these disclosure statements have been adjourned pending decision of this motion.

Under the proposed plan Peragine and LIA will contribute $100,000 (or $120,000) to pay all undisputed, unsecured claims. This excludes the claim of the DOT. Although not entirely clear from the terms of the plan or the disclosure statement, the Debtor's attorney has stated that payment

to the unsecured creditors must await resolution of the litigation with the DOT. (Tr., 8/28/91, p. 36). What the disclosure statement says on this issue is:

> In the unlikely event the New York DOT sustained its claim to an alleged license surcharge of $250,000–$700,000, the debtor's reorganization effort would be effectively terminated and unsecured creditors would not receive any distribution. If the present plan is confirmed prior to the resolution of this litigation, the creditors will be entitled to keep the $120,000 distribution provided therein.[3]

### Assumption of East Coast's Sublicense

Although the Debtor in its disclosure statement and elsewhere repeatedly asserts that it has assumed its license agreement with Beechcraft, it has not done so. A debtor may assume an executory contract or unexpired lease only if it cures or provides adequate assurance that it will cure any default under the lease and provides adequate assurance of future performance. 11 U.S.C. § 365(b). Shortly after the Debtor filed it moved to approve its assumption of its Sublicense with Beechcraft. The motion was opposed and ultimately was resolved by a stipulation that assumption would await decision of the adversary proceeding transferred to the Bankruptcy Court. Should East Coast lose that adversary proceeding, it will be able to assume its Sublicense at Republic Airport only by paying or providing adequate assurance of payment of whatever was owed when it filed, which DOT claims to be more than $300,000.

According to the Debtor's most recent disclosure statement, general unsecured creditors, who the Debtor estimates are owed $120,000, will receive whatever is left over from $100,000 after payment of administrative claims estimated to run $25,000 and priority claims calculated to be $30,000. Not included in this estimate is DOT's claim.

According to a liquidation analysis attached to the proposed disclosure statement (Ex. E), East Coast's only assets at the present time are office equipment of a value of $5,000, insurance proceeds for a damaged Jeep automobile in the amount of $2,500, and a counterclaim against DOT for $50,000. All receivables have been collected.

The basis for valuing a claim against DOT at $50,000 is unknown since East Coast has never asserted a monetary claim against the agency.

A 1988 Income Statement and Balance Sheet for East Coast shows total assets of minus $28,281.60 and a total equity of minus $258,943.91. A 1989 balance sheet covering the period after the company filed under Chapter 11 shows assets of minus $112,845.19, a drop of $80.000 and a corresponding reduction in equity to a minus $380,200.75, a decline of $120,000. (Tr., 7/30/91, pp. 46–47; DOT Aff., Exs. F, G).

At the close of DOT's presentation and after it rested, East Coast moved for a directed verdict. While the Court originally said that it considered such a verdict unavailable, it later issued a memorandum dated April 10, 1991 stating that it would deem the motion to be one made under Federal Rules of Bankruptcy Procedure 7041 and 7052 and would rule on the motion at the conclusion of the evidence. The Court directed East Coast to be prepared to proceed with its evidence on the adjourned date. The Court also advised the parties that it is the practice of this Court to take judicial notice on a motion to convert of the entire record. This led to a request by East Coast for treatment of the motion as a contested matter. While the DOT originally opposed the motion, it agreed that Bankruptcy Rule 9014 provided that a motion to convert is a contested matter. The Debtor then said it would submit an appropriate order, but to this point in time it has not done so. Nevertheless, this Court deems this proceeding to be a contested matter to which Rule 9014 applies.

---

**3.** In the Debtor's Opposition to DOT's motion to convert, it stated flatly that "Payment could not be made to the unsecured creditors until such time as the litigation with the New York Department of Transportation is resolved." (Supplemental Affirmation in Opposition, p. 2).

For the reasons which follow, the Court is denying East Coast's motion for a directed verdict and is converting this proceeding to Chapter 7.

## DISCUSSION

11 U.S.C. § 1112(b) authorizes conversion of a Chapter 11 proceeding to Chapter 7, or dismissal, after notice and a hearing, whichever is in the best interests of creditors and the estate, for cause, if a party in interest or the United States Trustee so requests.

█ The Debtor asserts that DOT lacks standing to bring the motion to convert this Chapter 11 case. This contention is without merit. DOT was scheduled as a creditor by the Debtor itself, albeit a disputed one. 11 U.S.C. § 101(10)(A) defines a creditor to mean an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(5)(A) defines claim to mean "right to payment whether or not such right is ... disputed." 11 U.S.C. § 1109(b) states that "a party in interest, including ... a creditor ... may appear and be heard on any issue in a case under this chapter." DOT has filed a claim for over $300,000, to which East Coast has never objected; it has standing to make this motion.

Among the grounds enumerated in 11 U.S.C. § 1112(b) include the following: (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; (2) inability to effectuate a plan; (3) unreasonable delay by the debtor that is prejudicial to creditors. DOT and creditors which support it rely on each of the foregoing.

█ The Court may convert a Chapter 11 to Chapter 7 even where no creditor moves for such relief. 11 U.S.C. § 105 authorizes the Court *sua sponte* to take any action necessary or appropriate to prevent an abuse of process.

Section 1112(b) is drafted to give "wide discretion to the court to make an appropriate disposition of the case when a party in interest requests ... The Court will be able ... use its equitable powers to reach an appropriate result in individual cases." House Report No. 95–595, 95th Cong. 1st Sess., pp. 405–406 (1977) *reprinted in* [1978] U.S.Code Cong. and Admin.News, pp. 5787, 5963, 6362, cited in *In re Larmar Estates, Inc.,* 6 B.R. 933 (Bankr.E.D.N.Y. 1980); *In re Coffee Cupboard, Inc.,* 119 B.R. 14, 17 (Bankr.E.D.N.Y.1990).

█ Peragine has used the shield of Chapter 11 to reduce East Coast to an empty shell having no purpose other than to carry on his feud with the DOT. East Coast describes this reorganization as a two party dispute with the DOT. (Debtor's Application to Dismiss, dated March 11, 1992, Par. 7; Tr., 5/29/92, p. 19). "Chapter 11 was never intended to be used as a fist in a two party bout. The Chapter is entitled reorganization and not litigation." (Emphasis Added). *In re HBA East, Inc.,* 87 B.R. 248, 260 (Bankr.E.D.N.Y.1988).

There can be no question that during the three years East Coast has loitered in Chapter 11 there has been a significant diminution of its assets. A comparison of the assets its schedules show East Coast had when it filed with the liquidation analysis forming part of its proposed disclosure statement establishes diminution beyond peradventure. Whereas when East Coast filed it had $76,000 in assets, including $40,000 in accounts receivable, it now has no assets other than a monetary claim against DOT, never asserted in any court, and office equipment, none of which it possessed when it filed, of an alleged value of $5,000.

For all practical purposes East Coast has been out of business for over two years, although it represented when it filed that the briefest of interruptions would do it irreparable harm. Not only have its assets decreased while in Chapter 11, but its liabilities for administrative expenses have mounted to an unknown amount. Mr. Hackeling has spent hours in this Court representing the Debtor, as has Mr. Feigenbaum. Often they have been here together. (Tr., 5/29/92) The Debtor's estimate in its proposed disclosure statement that administrative expenses will not ex-

ceed $25,000 seems wildly optimistic. The Debtor is incurring an administration expense building up its liabilities even as it combats this motion to convert.

Mr. Feigenbaum and Mr. Hackeling are not the only professionals being retained by East Coast. According to Peragine, he has also engaged other attorneys and accountants in pursuit of his grievance against the DOT. Although their retention has not been authorized disqualifying them from payments out of the estate, that is no assurance that they will not in the future make a claim against the Debtor.

Peragine also says that he has spent money on renovating the facilities at Republic Airport in the name of East Coast. The Debtor has not received authorization either to make renovations at Republic Airport or to borrow money from Peragine for the purpose of doing so.

While a huge administration expense is being built in litigating with the DOT, the premises which form the subject matter of the litigation, and the right to which the litigation has been brought to preserve, have been turned over to one of Peragine's other corporations, Long Island Airlines or Aviation Center, at no benefit to East Coast other than the payment of the rental to Beechcraft. Thus, the only beneficiary of the litigation has been a corporation which is a stranger to the present Chapter 11.

There need not be a significant diminution in the estate to satisfy Section 1112(b)(2). All that need be found is that the estate has suffered some diminution in value. *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y.1988).

In addition to diminution of assets, there is present here a total absence of a reasonable likelihood of rehabilitation.

When a corporation is involved the purpose of Chapter 11 is rehabilitation. Absent a reasonable amount of assets and a feasibly operating business, there is no reason for continuing a corporate debtor in Chapter 11. *In re 312 West 91st Street Co.*, 35 B.R. 346, 347 (Bankr.S.D.N.Y.1983); *In re Tracey Service Co., Inc.*, 17 B.R. 405, 409 (Bankr.E.D.Pa.1982). Whether the debtor has assets, whether the debtor has an ongoing business to reorganize, and whether there is a reasonable probability of a plan being proposed and confirmed are factors the bankruptcy court properly takes into consideration when considering whether to convert or dismiss a case filed by a business debtor. "It is not the purpose of Chapter 11 to allow a debtor a permanent cloak of protection while the estate assets continue to diminish and the operational coherency unravels." *In re Galvin*, 49 B.R. 665, 669 (Bankr.D.C.N.D. 1985).

East Coast ceased operations at least two years ago and perhaps much earlier. It survives only as a name on a sign post and as a plaintiff in a lawsuit in this Court and a complainant to the FAA. The Debtor has no employees and no assets. All its proposed financial disclosure statement says about its current operations is the following: "The debtor has not continued its pre-petition operations while in Chapter 11. The Debtor will not assume any pre-petition contracts upon entry of its plan of reorganization."

East Coast's sole response to the overwhelming evidence adduced by DOT, that East Coast has ceased operations and has exhausted its assets and does not even occupy the premises over which it has been battling for several years, is that the Supreme Court held in *Toibb v. Radloff*, —— U.S. ——, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) that the Code contains no "ongoing" business requirement for a Chapter 11 reorganization. —— U.S. at ——, 111 S.Ct. at 2199. But the issue the Supreme Court was addressing was whether an individual consumer debtor, not engaged in any business, was eligible for relief under Chapter 11 or was limited to Chapter 7 and Chapter 13.

In rebuffing arguments that permitting a non-business Chapter 11 would lead to abuse, the Court said, "The Code gives Bankruptcy Courts substantial discretion to dismiss a Chapter 11 case in which the debtor files an untenable plan of reorganization. *See*, Sections 1112(b) and 1129(a)."

*Id.* —— U.S. at ——, 111 S.Ct. at 2201. Thus, the Court counted on the Court's power to utilize Section 1112(b), exactly as the DOT is doing here to stop misuse of Chapter 11 by debtors having no business to reorganize.

Further, "rehabilitation" of an individual debtor does not require an ongoing business because his rehabilitation lies in the reorganization of his financial life. Whatever occurs in the bankruptcy court the individual does not cease to exist. The same is not true of a corporate debtor. Its rehabilitation requires an ongoing business, otherwise, it is just a name.

▪ The fact that a debtor who has no ongoing business can file does not mean that the lack of an ongoing business is not evidence of the presence of the factors made significant by Section 1112(b). In this case, the fact that the Debtor when it filed was actively engaged in business and no longer is, is evidence that there has been a diminution of assets, that there is no reasonable possibility of rehabilitation and that creditors have been injured by the delay.

The Debtor has demonstrated no interest in reorganizing its affairs in Chapter 11. It has engaged in a few desultory motions only to spike DOT's motion to convert. It has yet to establish an effective bar date. It has taken no action to eliminate disputed claims. The Debtor's only interest in this Chapter 11 is to drag it out while Peragine continues to pursue his grievance against the DOT.

The Debtor has no ability to effectuate a plan out of its own resources. The plan which Peragine says he is willing to subsidize cannot be confirmed. Mr. Peragine is willing to pay all creditors except DOT. If East Coast loses its litigation with DOT, he cannot be compelled to give East Coast money to pay the claim. If East Coast wins that litigation, nothing will be owed DOT. In either event, DOT gets nothing.

Chapter 11 is not designed to provide a safe haven for riskless litigation. It is not designed to allow a corporate party to litigate its obligations, safe in the knowledge that if it loses it will not be required to pay anything because it will be judgment proof in every sense of the word.[4]

That an investigation by the FAA is in progress is not a reason for continuing East Coast indefinitely in Chapter 11. FAA has agreed to investigate charges made jointly by East Coast and Peragine that the DOT acted, in derogation of 49 U.S.C.App. § 2201, in not acceding to East Coast's request to become a FOB operator. How long the FAA's investigation will take and what its results will be are unpredictable. It is unlikely that DOT will acquiesce in an unfavorable determination and an appeal may take years. That being an FBO operator is not any guarantee of riches is shown by the fact that Cosmopolitan, which held that status went into bankruptcy. Moreover, what advantage East Coast as it is today, a corporation without assets, can gain from a favorable determination is equally unclear. The ephemeral possibility of some benefit to East Coast some time in the indefinite future cannot overcome the clear evidence that the DOT has satisfied the conditions for demanding conversion of this protracted and burdensome Chapter 11 proceeding.

There can be no doubt that the three years this Debtor has been in Chapter 11 have been prejudicial to creditors. All its assets have been used up. What was an active company is now an empty name. Administrative expenses of unknown magnitude have been created and are still being

---

4. This litigation is particularly riskless. East Coast is challenging its contractual obligation to pay five percent of its gross receipts, including all revenues generated from aircraft it owns or leases. Evidently East Coast has owned or leased no aircraft since 1988 and probably has had no gross receipts since 1990. While DOT and Beechcraft have been enjoined from interfering with East Coast's operations at Republic Airport, East Coast has ceased such operations, turning over its planes and its operations at Republic to a stranger to the Sublicense, thus radically altering the status quo which the injunction was intended to preserve, all to the potential prejudice of DOT. East Coast has laid the groundwork for the argument that even if the DOT wins, it is entitled to nothing for Peragine's operations at Republic since 1988 because not carried on by East Coast and not involving East Coast planes.

generated. The delay has made it harder to trace the pre-petition transfers of significant assets made by the Debtor within one year prior to filing. Records may have disappeared, memories have dimmed and there may be other impediments to recovery.

Conversion is in the best interest of creditors because a trustee may be able to recover assets which the Debtor has had no interest in pursuing. Among the transfers which might yield assets to a disinterested trustee are East Coast's pre-petition sale of its airplanes, the transfer of the Debtor's inventory and of its operating certificate to LIA and the million dollar sale by LIA of various slots at LaGuardia Airport which may have been the property of East Coast.

While DOT has more than demonstrated the existence of the causes on which it relied in moving to convert, what has been disclosed during the course of the hearings on the DOT's motion provides independent cause for conversion. *See, In re Sal Caruso Cheese, Inc.,* 107 B.R. 808 (Bankr. N.D.N.Y.1989). Peragine is an unfit trustee of East Coast's assets. Shielded by Chapter 11 from scrutiny by East Coast's creditors, Mr. Peragine has treated East Coast as his personal property to be dealt with like his other corporations without notice to creditors and without authorization from the Court. He has turned over East Coast's premises at Republic Airport to a related company under terms he has never elected to disclose for no compensation. Without any authorization from this Court, he has transferred East Coast's operations, such as they are, from Farmingdale to Syosset. Claiming to be acting on behalf of East Coast, he has hired accountants and attorneys, spent a "pile" of money on renovations on premises which companies other than East Coast are occupying.

East Coast has filed no operating reports since July 1989, therefore, no one can know what has happened to its assets or what expenses, if any, it has paid. The failure to submit the required monthly operating reports alone constitutes cause under Section 1112(b). *In re Copy Crafters Quickprint,*

*Inc.,* 92 B.R. 973, 986 (Bankr.N.D.N.Y. 1988); *In re Cohoes Indus. Terminal, Inc.,* 65 B.R. 918, 922–23 (Bankr.S.D.N.Y.1986).

As Peragine has collected money from its accounts receivable, he has spent it as he elected, for what expenses no one knows. Whether or not permitting one of Peragine's other corporations to occupy East Coast's premises at Republic Airport is, or is not, a technical violation of the Sublicense, by leaving East Coast open to the claim that it is, he has jeopardized East Coast's license agreement with Beechcraft. He has thereby put East Coast's principal asset when it filed at risk.

This Court is persuaded that the DOT has satisfied its burden under § 1112(b) that there is a continuing loss to or diminution to the estate coupled with the absence of a reasonable likelihood of rehabilitation. The Debtor has no present ability to effectuate a plan of reorganization. Further, the Debtor's sojourn in Chapter 11 has been prejudicial to its creditors because its assets have not been safeguarded. The Court finds that conversion of this case under § 1112(b) of the Code to be in the best interest of the creditors and the estate.

## CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. 157(b)(2)(A).

The DOT and the other creditors moving to convert this case from Chapter 11 to Chapter 7 have standing to do so.

There is present here continuing loss to or diminution of the estate since the Debtor filed and absence of a reasonable likelihood of rehabilitation.

The Debtor has no present ability to effectuate a plan.

Since the Debtor filed in April 1989 there has been unreasonable delay that is prejudicial to creditors.

Conversion to Chapter 7 is in the best interests of the creditors and the estate.

For the foregoing reasons, this proceeding is hereby converted to Chapter 7.

An Order consistent with the foregoing Findings of Fact and Conclusions of Law is being issued contemporaneously.