**In re HAMPTON HOTEL
INVESTORS, L.P.,
Debtors.**

**No. 98–43032 (REG).**

United States Bankruptcy Court,
S.D. New York.

Nov. 14, 2001.

348

Brand Cayea & Brand, LLC, New York City, By: Donald J. Cayea, for the Debtor.

Peter Marc Stern, New York City, By: Peter Marc Stern, for William E. Murray.

Carolyn S. Schwartz, Office of the United States Trustee, New York City, By: Brian Masumoto, for U.S. Trustee.

## DECISION AND ORDER ON MOTION BY UNITED STATES TRUSTEE TO CONVERT OR DISMISS CHAPTER 11 CASE

ROBERT E. GERBER, Bankruptcy Judge.

### Introduction

In this case under chapter 11, commenced by Hampton Hotel Investors, L.P. (the "Debtor," a limited partnership that, until a point earlier in its chapter 11 case, operated an "18 key country inn"[1] in Quogue, in the "Hamptons" area of Long Island, New York), the United States Trustee ("UST")—supported by creditors William E. Murray ("Murray") and the New York State Department of Taxation and Finance—moves, pursuant to Bankruptcy Code section 1112(b), to

---

1. *See* Petition, filed April 28, 1998 (Docket # 1).

convert the case to chapter 7.[2] The motion establishes an overwhelming case for conversion, and raises only one issue worthy of significant discussion, raised by the Debtor's general partner, through whom the Debtor acted during the pendency of this chapter 11 case—the extent to which provisions in the Debtor's Limited Partnership Agreement ("Partnership Agreement"), under which the limited partners authorize various kinds of self-dealing by their general partner, authorize or excuse conduct that would otherwise be unthinkable in a bankruptcy case.

As described more fully below, the Court concludes that whatever safe harbor those provisions provide vis-à-vis self-dealing disputes between the Debtor's limited partners and its general partner, they are wholly irrelevant to a debtor's entirely separate duties to its creditors, and the fiduciary duties imposed on a debtor in possession in a case under the Bankruptcy Code. Where, as on a motion to convert, the Court is addressing those concerns, such provisions are no defense.

For that reason, and others, the UST's motion is granted.

### Discussion

As a consequence of disputed issues of material fact underlying aspects of the motion and concerns on the part of the Court as to the status of the case, the Court conducted a two day evidentiary hearing on the motion,[3] and the matter was extensively briefed and argued.[4] The following are the Court's findings of fact, conclusions of law, and bases for the exercise of its discretion in connection with the motion.

### I.

### Findings of Fact

### A.

Based on documentary evidence, admissions, and uncontroverted assertions of fact, the Court finds as facts the following.

The Debtor is a limited partnership, organized under the law of New York, which was formed in 1985. Its general partner is

---

**2.** After the disclosure of certain information at the first of the two days of evidentiary hearing on the UST's motion, the UST modified an earlier request to convert or dismiss, and sought, instead, conversion and not dismissal. *See* n. 4 below.

**3.** In lieu of a third day of evidentiary hearing, the parties stipulated to the admissibility of additional documents and the closing of the evidentiary hearing record. An important aspect of the evidentiary hearing, on each of its two days, was the testimony of the Debtor's general partner, both as to its substance and his demeanor, both of which underlie the findings of fact set out below. References to proceedings on the two days of the evidentiary hearing are referred to as Hrg. # 1 (or # 2) Tr. at ___.

**4.** The UST's original motion (Docket # 22, originally filed in 1999, before Hon. James Garrity, this Court's predecessor, and based

on failures to file monthly operating reports and to pay UST quarterly fees), was continued for a relatively long period, as matters initially of concern to the UST were cured. However, it was renewed by the UST at a status conference earlier this year, after alleged further failures in this regard. Shortly before the scheduled evidentiary hearing on the UST's continued motion, the Debtor cross-moved to dismiss its case (Docket # 40), to which the UST objected (Docket # 49), arguing, among other things, that conversion, rather than dismissal was appropriate. After two evidentiary hearing sessions, post-hearing briefs were filed by the Debtor (Docket # 53), and by the UST (Docket # 54), and the Debtor then filed a reply. (Docket # 57). The various submissions by those parties on the motion are cited as "UST Motion ___"; "Debtor Dism. Motion ___"; "UST Dism. Object ___"; "Debtor Post–Hrg. Br. ___"; "UST Post–Hrg. Br. ___"; and "Debtor Post–Hrg. Reply ___," respectively.

Joel I. Beeler, through whom the Debtor has acted at all relevant times in this case.[5]

For a number of years, the Debtor operated a hotel property at 47 Quogue Street, Quogue, New York (the "47 Quogue Street Property"). The Debtor did business as "The Inn at Quogue" in coordination with another hotel property, located across the street at 52 Quogue Street (the "52 Quogue Street Property"). (The two properties together are referred to as the "Inn"). The Debtor operated its business from 689 Fifth Avenue, in New York City, the offices of its general partner, Beeler.[6]

The 52 Quogue Street Property, which, like the 47 Quogue Street Property, had rooms in which guests could stay, was known as "Weathervane" or "East House." (The East House had three times as many rooms as the Debtor, which had 18.)[7] Prospective guests who called "The Inn at Quogue" might be placed in either building, depending upon the guest's request or the availability of rooms. Beeler and Murray entered into an agreement dated as of November 4, 1997, under which, among other things, Murray invested in East House Associates LLC ("East House LLC"), which would own and operate not just "The Inn at Quogue" (which, from the context in which that agreement stated it, probably referred solely to the 47 Quogue Street Property), but also the Weathervane, and the restaurant situated at the 47 Quogue Street Property. Murray thereby received what was originally an equal share, with Beeler, in the ownership of East House. Beeler represented to Murray that East House would own "80% of the deed to the property and business known as 'The Weathervane' as well as the property and business known as 'The Inn at Quogue' as well as to the business and property of the restaurant."[8]

This case, which was filed on April 28, 1998, is the second of two chapter 11 cases filed by the Debtor. The Debtor filed a previous chapter 11 petition in the Southern District of New York on August 29, 1991, and confirmed a plan in that case on February 28, 1995.[9] In connection with its acquisition of the fee interest in the 47 Quogue Street Property, the Debtor gave a purchase money mortgage to an entity called MicMac Inn Corp., which later assigned its mortgagee interest to one Morris Weingarten.[10] As of the time of filing of this case, the Debtor had defaulted on both the first mortgage on the 47 Quogue Street Property, held by Weingarten, and a second mortgage, held by Pan American Development Corp.,[11] and the 47 Quogue Street Property was in the hands of a receiver, as a consequence of a mortgage foreclosure action brought by Weingarten. This case was filed one day before a foreclosure sale scheduled for April 29, 1998 in connection with the Weingarten mortgage.[12]

The Debtor's schedule of assets expressed a stated value for the 47 Quogue Street Property of $1,500,000. The Debtor's Schedules and Statements also stated that personal property physically located on the premises of the 47 Quogue Street Property in fact belonged to other persons

---

5. Debtor's Aff. under then-Local Rule 52 (later, Local Rule 1007–2) ¶ 3.

6. Rule 52 Aff. ¶ 2.

7. Hrg. # 2 Tr. at 28–29.

8. Murray Exh 1.

9. Response of The New Quogue Inn to UST Motion ¶ 2.

10. Debtor Dism. Motion ¶ 2.

11. *Id.* at ¶ 3.

12. *See* Petition; Rule 52 Aff. ¶ 6.

or entities: (a) "[f]urniture, art, televisions, clothing and stereo" was said to be owned by Joel I. Beeler and/or Estate of Blanche Beeler, 689 Fifth Avenue, New York City, and (b) "[f]urniture, fixtures and equipment in restaurant," said to be of a value of $200,000, was said to be owned by Lawrenceville Equities, Inc. whose address also was 689 Fifth Avenue, New York City.

In June 1998, early in the Debtor's chapter 11 case, Weingarten filed a motion seeking its dismissal, or, in the alternative, relief from the stay to allow Weingarten to proceed with his foreclosure sale. The Debtor and Weingarten then entered into a stipulation (so ordered by Judge Garrity on August 24, 1998), providing that the 47 Quogue Street Property would be sold by auction under Bankruptcy Code section 363 in order to satisfy Weingarten's secured claim.[13]

By a revised order dated February 22, 1999, Judge Garrity authorized the sale of the 47 Quogue Street Property to the successful bidder at the auction sale, creditor Murray. Murray then assigned his purchase rights to New Quogue Inn, LLC ("New Quogue Inn"), and the closing of that sale took place on or about March 3, 1999.[14]

The Debtor ceased operations at the end of October 1998, shortly before the sale of the 47 Quogue Street Property. It has not operated as a business since that time. From November 1998 through March 2001, the operating reports state that there was no rental income, except for the month of December 1998, for which $172 in rental income was shown.[15]

One week after the closing on the sale of the Hotel, on March 10, 1999, the Debtor commenced an adversary proceeding against New Quogue Inn, asserting, among other things, that when Murray had purchased the 47 Quogue Street Property at the February 1999 auction, he had not purchased the rights to refer to the 47 Quogue Street Property as the "Inn at Quogue," and that New Quogue Inn was using the "Inn at Quogue" name, which allegedly still belonged to the Debtor, without authority. The adversary proceeding was ultimately settled, with New Quogue Inn paying the Debtor an additional $27,500 for the right to use the "Inn at Quogue" name, if and to the extent New Quogue Inn had not purchased the right to use it. With the Debtor having no other remaining assets, that $27,500 represents the full extent of the Debtor's present resources, and the Debtor has no continuing business to reorganize.

On July 3, 1999, as previously noted, the UST filed this motion in its original form—then, as also noted, for conversion or dismissal of this case, and then, predominantly, for failures to file the monthly operating reports required by the UST and failures to pay UST quarterly fees. The Debtor and the UST consensually agreed to the continuance of the UST's motion while matters of concern to the UST were cured and an adversary proceeding that could benefit the Debtor proceeded, and the then-delinquent reports were thereafter filed and the then-delinquent fees were paid.

However, at a status conference on March 3, 2001, the UST reported that the Debtor was once more delinquent in the filing of monthly operating reports and in the payment of UST quarterly fees, and, at

---

**13.** Debtor Dism. Motion ¶ 4.

**14.** *Id.* Matters related to Murray's bid for the 47 Quogue Street Property that were thereafter revealed (and which, in this Court's view,

are highly relevant to this motion) are discussed below.

**15.** *See* Joint Exh. 5.

the request of the UST, the motion was set for hearing. To address material disputed issues of fact, and questions raised by the Court,[16] the matter was set for an evidentiary hearing.

At the evidentiary hearing, a considerable number of new matters emerged, the great bulk of which dwarfed in importance the matters that originally had been the stated concerns of the UST. The failure to file the required operating reports had been cured, but the operating reports raised serious new questions. It turned out that the operating reports that had been filed were erroneous and the corrected reports raised new issues—e.g., what had happened to more than $45,000 that would have been in the Debtor's coffers according to the original reports.[17] Matters established from the corrected operating reports, or otherwise at the evidentiary hearing (all of which the Court finds as facts) were as follows:

*(a) Unauthorized Payments to Professionals.*

More than $13,000 in attorneys' fees and $2,000 in accountant fees were paid by the estate without securing court approval, required under Bankruptcy Code sections 330 and 331, and without application for such approval.

Indeed, no order was ever sought or obtained even for retention of an accountant, or for trademark counsel, one of the two counsel that had been paid, post-petition, by the estate.[18]

*(b) Unauthorized Post-petition Payments to Debtor's General Partner.*

Beeler repeatedly made payments to himself or to entities in which he had an interest from assets of the estate during the pendency of the chapter 11 case. It appears that the amount of these payments exceeded $22,000, of which approximately $11,000 was transferred to a special account belonging to Beeler.[19]

While it does not appear, on this record, that any of this was theft (as, for the reasons noted in the subparagraph that follows, it appears that Beeler and/or entities he controlled advanced considerably more than that amount, presumably to cover operating losses), Beeler caused payments to be made to himself and his affili-

---

**16.** The Court asked the parties to address at the evidentiary hearing, among other things, any failure of the Debtor to comply with UST Operating Guidelines; the amount and nature of the Debtor's liabilities sufficient to allow a determination as to whether the Debtor was or would be administratively insolvent; whether the Debtor intended to comply with the Absolute Priority Rule, and whether the Debtor would be able to obtain the consent of an impaired class of creditors; and the manner in which the Debtor intended to fund a plan of reorganization. *See* UST Dism. Object ¶ 13.

**17.** At least in part, the differences resulted from a practice, in connection with the operating reports before their correction, of reporting the Debtor's revenues based on some kind of allocation of revenues between the hotel operations at the 47 Quogue Street

Property and the 52 Quogue Street Property, in contrast to cash the Debtor actually received. The Court is not now in a position to make factual findings in detail with respect to the exact amounts of the discrepancies and/or any civil liability therefor; it is sufficient, for the Court's purposes to note that discrepancies existed; that payments or transfers of the type noted existed; and that they are an appropriate area for further investigation and/or inquiry.

**18.** *See* UST Post–Hrg. Br. at 14–15, a summary of transactions shown in the operating reports filed with the UST. Of this, $11,640 appears to have been paid to Debtor's counsel Brand, Cayea & Brand, LLC, and $2,000 to the Debtor's trademark counsel Frank Decovern, Esq.

**19.** Joint Exh. 2.

ates with apparent total disregard of the fact that he was a fiduciary acting in a case under chapter 11.

### (c) Borrowing Without Court Approval.

A considerable amount (and perhaps all) of the payments made to Beeler and his affiliates, as described in the preceding subparagraph (with the Court accepting his testimony in this respect), was to repay loans Beeler (or entities he controlled) made and/or funds Beeler or such entities advanced to the Debtor (or on Debtor's behalf), totaling approximately $115,000. But such loans (assuming they were loans, and not equity contributions) were made without ever seeking, much less obtaining, an order, required under Bankruptcy Code section 364, authorizing borrowing by the Debtor. Nor, so far as the record reveals, was the practice of making advances to the Debtor, and then repaying them, ever disclosed for the benefit of the Court or creditors, except as might be inferred from a study of the operating reports.

Once more, Beeler operated the Debtor with apparent total disregard of the fact that the Debtor was in a case under chapter 11.

### (d) Unauthorized Payment of Pre–Petition Debt.

Beeler caused payment to be made to an entity called Barter Advantage, Inc. (in the approximate amount of $1,466), in September 2000, on account of a pre-petition debt, without obtaining (or seeking) an order authorizing such payment. This payment was said to be for the purpose of securing rights from Barter Advantage worth $25,000 [20] (though the payment was made after the Debtor was no longer in operation), but Barter Advantage was not listed in the Debtor's Schedules and Statements as either the source of any asset, or even as a creditor.

Once more Beeler operated the Debtor as if it were not a debtor under chapter 11.

### (e) Failures to Collect Receivables from General Partner's Affiliate.

As noted, when corrected operating reports were filed reflecting receipts and disbursements based on a cash basis—as contrasted to the earlier monthly operating reports, which were based on an accrual or "allocation" basis—approximately $45,000 that would have been present in the estate based on the accrual or allocation was not there.

If those allocations were genuine, there was a receivable to be collected from the East House Venture (in which, it will be recalled, Beeler had an interest) for revenues receivable, and/or expenses to be shared, in connection with the two entities' coordinated operation of the Inn. As Beeler put it:

> East House didn't fully reimburse the Debtor. It is my present opinion that East House owes the Debtor a good bit of money.

(Hrg. # 2 Tr. at 56). Beeler took little, if any, action to recover such sums.[21]

---

20. Ltr. of 3/16/01 from Debtor's Counsel. Though admitting that this payment covered (at least in part) pre-petition claims, the Debtor's counsel stated that "[t]he Debtor's General Partner advanced the money so that [the Debtor] could make the payment and preserve the asset."

21. Another matter asserted by the UST to reflect abuse or mismanagement—Beeler's occupancy of a suite at the Hotel, for "long weekends" in the summer without paying for it, and the Debtor's renting out of Beeler's suite during the week only when "we were absolutely full" (Hrg. # 2 Tr. at 31–33)—warrants further inquiry, but the Court is reluctant to make a finding now based upon this matter without a fuller record as to the extent, if any, that the suite was used for busi-

*(f) Conflicts of Interest re General Partner Obligations.*

Although a general partner of the Debtor, responsible under state law to meet the contractual obligations of his partnership, Beeler repeatedly resisted efforts by the UST to ascertain his net worth, even after Beeler proposed to satisfy partnership obligations with a plan which, in part, he would fund. Except to the extent (if any) that the possibility of his making a limited payment to fund a reorganization plan could be deemed to be such, Beeler likewise failed to take any steps this Court can discern to recognize and collect upon the obligation of a general partner to meet obligations to creditors.

Indeed, the Debtor's counsel candidly stated, at the first evidentiary hearing session (as if this excused Beeler's conduct in this regard, rather than explaining exactly why a trustee is necessary):

> In terms of the analysis of his duties, what I believe he would be doing is chasing himself.

(Hrg. # 1 Tr. at 34).

*(g) Beeler's Agreement re Bidding on Estate Assets.*

Most egregious of all, in the Court's view, is Beeler's conduct in connection with the Debtor's sale of the 47 Quogue Street Property. It was disclosed at the evidentiary hearing on this motion that shortly before the upcoming auction sale of the 47 Quogue Street Property, Beeler and Murray entered into an agreement, dated December 10, 1998 (UST Exhs. 1 and 2), with respect to a bidding by Murray for the 47 Quogue Street Property and an interest on the part of Beeler in the 47 Quogue Street Property after its purchase. The agreement provided, among other things, that in consideration of the transfer of a portion of Beeler's interest in East House Venture, and Murray's promises: [22]

3. Murray to attend the auction sale of the Inn at Quogue to be held on December 10, 1998 and make best efforts to buy the Inn. In addition, he will negotiate with Morris Weingarten prior to the sale to obtain a postponement thereof. After the sale Beeler shall be granted a ten (10%) percent interest in the Inn at Quogue . . . .

11. Net cash flow before [subsequent] sale [of properties] to be distributed for the East House sixty (60%) Murray forty (40%) percent Beeler. Ninety (90%) percent to Murray and ten (10%) percent to Beeler for The Inn at Quogue . . . .

18. Upon [subsequent] sale of the properties the net proceeds shall be applied and distributed as follows:

> . . .
>
> $100,000 to Beeler without interest
>
> $550,000 to Beeler without interest
>
> . . .

---

ness purposes, rather than personal ones, and any business advantages that might make Beeler's occupancy of the suite appropriate. Another matter raised by the UST—Beeler's failure to take more aggressive action with respect to the Inn's restaurant tenant, who failed to make payments due to the estate; who occupied, without payment, rooms in the Inn, and who interfered with the Inn's operations. Each of them, while appropriate for further inquiry and investigation, might be explained as an exercise of appropriate business judgment, and, based on the facts now known to it, the Court does not regard that as egregious as the other matters described above.

22. In the agreement, "Beeler" was defined as referring to Joel I. Beeler and "all affiliates and investors in Hampton Hotel Investors, L.P., or Palm Gardens Investors, L.P." "Murray" was given a similar broad definition, covering not just Murray personally but other people and affiliates.

$352,000 to Beeler for sale and payroll taxes for which Beeler is personally liable

The Balance, 60% to Murray and 40% to Beeler

(UST Exh. 2).[23]

In other words, Beeler agreed with Murray to have Murray bid, in part on Beeler's behalf, on assets of the estate, and to take an interest in the assets of the estate that would be purchased if Murray were to be (as he ultimately was) the successful bidder. So far as the record discloses, this agreement was never disclosed to the Court, nor to anyone else.

While full analysis of the propriety of that agreement is muddied in part because Murray was only to bid on the 47 Quogue Street Property (and a subsequent sale might include the East House, as well), implicit in Beeler's agreement with Murray, by reason of the agreement's contemplation of a further sale and the division of the profits thereon, is a view on the part of each of Beeler and Murray that Murray, as the stalking horse bidder, would be paying less for the 47 Quogue Street Property than it was then worth and/or ultimately would be worth, and that the difference in value would inure to Beeler and Murray, and not to the estate.

As previously noted, Murray (or to be more exact, now that more facts are known, Murray and Beeler) was the winning bidder at the auction, providing adequate consideration of $923,000. It is not yet possible to ascertain (if it ever will be) what the two properties might have fetched under other circumstances, and especially what the 47 Quogue Street Property component of any consideration for the two properties would be. And while the difference between the aggregate consideration that the Murray/Beeler duo paid for the 47 Quogue Street Property, of $923,000, and the $1,500,000 value Beeler attributed to the property in the Debtor's schedules is troubling, there are too many possible reasons for that $577,000 difference to make further findings in this regard at this time. But what is clear is that Beeler, the principal of the debtor in possession, a fiduciary, was making agreements with ostensible third parties with respect to bidding on the main asset of the estate, and taking an undisclosed interest in the asset to be acquired.

Beeler testified at the continued hearing on the conversion motion that "the Partnership Agreement gives me the absolute right to self-deal."[24] The Court believes Beeler's assertion to be contradicted by the Partnership Agreement upon which he relied. Beeler cited section 4.5 of the Partnership Agreement as authority;[25] in post-hearing briefing, Debtor's counsel cited section 4.6.[26]

---

23. The agreement was initially in the form of a handwritten markup of a typed document, and was later retyped in a "clean" format. Other provisions in the earlier typed document, providing for Beeler's right to lease the restaurant at the Inn at Quogue, and an allowance of money to Beeler for legal fees to "wind up the Hampton Hotel Investors L.P. Bankruptcy," were deleted. *Compare* UST Exh. 1.

24. Hrg. # 2 Tr. at 146. This was stated not in the context of explaining or justifying his agreement with Murray with respect to Murray's bidding on the 47 Quogue Street Property, but rather loans by Beeler to the Debtor partnership, and the partnership's alleged duty to indemnify Beeler for all acts other than gross negligence. (*Id.* at 145). Shortly thereafter, Beeler stated that "[t]he self-deal and the mention of that kind of gave me chills." (*Id.* at 147). The disclosure of the matters discussed above gave the Court the same feeling.

25. Hrg. # 2 Tr. at 146–147.

26. Debtor Post–Hrg. Br. at 5.

Section 4.5 of the Partnership Agreement provides, in full:

*Purchase of Goods or Services from the General Partner or His Affiliates.* The fact that the General Partner or any of his agents, employees, or affiliates are, directly or indirectly, interested in or connected with any person, firm or corporation employed by the Partnership to render or perform a service or from which or whom the Partnership may buy merchandise or other property shall not prohibit the General Partners from employing or otherwise dealing with such person, firm or corporation and neither the Partnership nor any of the Limited Partners, as such, shall have any rights in or to any income or profits derived therefrom.

(Debtor Agreement of Limited Partnership at 13).

That provision covers, as its catch-line implies, the partnership's securing goods or services from its general partner or his affiliates. Apart from the section's silence with respect to any duties in bankruptcy, neither that section's catch line, nor its substance, covers agreements with respect to bidding on partnership assets, or securing profits therefrom.

Section 4.6, provides, in full:

*Other Activities of Partners.* Any Partner may engage in business ventures and investments, *other than in connection with the Partnership,* of any nature whatsoever, including, but not limited to, the ownership and management of commercial and other real estate. Neither the Partnership nor the other Partners shall have any right to or interest in any such *other* business venture or investment, or to share in any income, profit or other benefit derived therefrom.[27]

(*Id.* at 14 (emphasis added)). Aside from the silence of section 4.6 with respect to its effect, if any, on conduct in a bankruptcy case, section 4.6, by its terms, refers to activities of the general partner and limited partners *other than* in connection with the partnership, and it does not address the propriety of their conduct in connection with partnership affairs, such as agreements with respect to bidding on partnership property, or securing the benefits therefrom.

After the filing of the UST motion, the Debtor sought to dismiss its case, as an alternative to conversion. In its motion, the Debtor stated, among other things:

The debtor is no longer operating and has no current revenue nor has had revenue since at least June 2000.[28] . . .

---

**27.** Additionally, Article VII, captioned "Conflicts of Interest," makes disclosures to the other partners with respect to the General Partner's conflicts of interest:

The formation of the Partnership and the conduct of its business involve material conflicts of interest between the General Partner [Beeler] and his affiliates, and the Partnership. The most significant conflicts are as follows:

(1) Although the General Partner stands in a fiduciary capacity to the Limited Partner, and is required to employ integrity and good faith in his dealings with the Partnership, no assurance may be given that adequate remedies will be available to the Limited Partner in the event the General Partner fails to perform his fiduciary obligations. Moreover, the General Partner is not bonded and has limited net worth and, therefore, may not be able to respond to a judgment against him. In addition, this Agreement contains certain limitations on the General Partner's liability by reason of such breach.

(2) The General Partner and his affiliates may engage in business ventures of any nature and description, including the real estate business and the Limited Partners shall have no right in or to such independent matters.

**28.** As noted above at page —— 6, the Court believes that the Debtor in fact has had no revenue since December 1998.

Consequently, the Debtor believes it is in its best interests and the interests of all creditors to dismiss the Voluntary Petition and joins with the U.S. Trustee in her request to do so.... Moreover, even if the debtor could effectuate a plan, unsecured debts most certainly would have been impaired thereby.

(Debtor Dism. Motion ¶ 9). Likewise, the Debtor stated in its dismissal motion that "[t]here is no viable plan for rehabilitation and further delay presents risk of diminution of what little assets are left." *Id.* at ¶ 11.

Thereafter, however, Beeler stated that he wished to proceed with a plan of reorganization, which he would fund in substantial part, and, in substance, the Debtor's earlier cross-motion seeking dismissal was withdrawn.

### B.

Based on inferences and conclusions drawn from the facts described above, and its observation of the demeanor of the Debtor's general partner, Beeler, the Court makes the following additional findings of fact.

This case was managed, in numerous material respects, with a total disregard for the duties of a debtor in possession in a case under the Bankruptcy Code.

The Debtor has been managed, in numerous material respects, as if it were not in bankruptcy at all.

The Debtor's general partner, Beeler, through whom the Debtor has acted during the pendency of this chapter 11 case, acted knowingly and consciously in connection with the acts described above.[29]

The foregoing conduct on the part of a debtor in possession in a case under chapter 11 of the Bankruptcy Code, or an individual acting on a chapter 11 debtor in possession's behalf, is unthinkable, and results in a series of classic violations of the fiduciary duties of an individual managing the affairs of a debtor in possession.

Beeler has steadfastly failed to look to his own personal accountability for obligations of the Debtor partnership. If allowed to continue to manage the Debtor, Beeler would continue to face a blatant conflict of interest, as between maximizing the assets of the partnership available for satisfaction of creditor claims, on the one hand, and looking to his personal resources to satisfy those claims, on the other. Beeler has every incentive to delay and/or impair any attempt to marshal his assets for the benefit of the Debtor's creditors.

The self-dealing actions by Beeler in this case cry out for investigation. But no such investigation can reasonably be expected to take place so long as Beeler remains in control of the Debtor.

### II.

#### Conclusions of Law

Bankruptcy Code section 1112(b) governs whether this chapter 11 case should be dismissed or converted to chapter 7. It provides, in relevant part:

> [T]he court may convert a case under this chapter to a case under chapter 7 ... or may dismiss a case ..., whichev-

---

29. In his testimony at the evidentiary hearing, Beeler repeatedly blamed others for his conduct, expressly or impliedly to disclaim personal responsibility for anything he did. The Court does not find such assertions either credible or persuasive. In the Court's view, Beeler, a lawyer, cannot pass off responsibility for his own conduct and his own knowing acts, and whatever fault may be found on the part of his professionals, such pales in comparison to his own.

er is in the best interests of creditors and the estate, for cause. . . .

Grounds for such a finding of cause include:

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable ·delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any time fixed by the court. . . .

■ The decision as to whether to dismiss or convert is within the discretion of the court. *See, e.g., In re Woodbrook Associates,* 19 F.3d 312, 316 (7th Cir.1994); *In re Santiago Vela,* 87 B.R. 229, 231 (Bankr.D.Puerto Rico 1988) (cited by Debtor).

The Debtor has admitted that it meets criteria (1), (2), and (4).[30] The Court is unaware of any time that was actually fixed by the Court to propose a plan, making the applicability of factor "(4)" uncertain, but the Court additionally finds that the Debtor's failure to file a plan under the facts of this case, 3–1/2 years after its filing, constitutes unreasonable delay by the debtor that is prejudicial to creditors, making factor "(3)" applicable as well.

■ Additionally, consistent with section 1112(b)'s use of the introductory words *"includes"* (emphasis added), it is well established that the listed factors are not exclusive. *See Carolin Corp. v. Miller,* 886 F.2d 693, 698–99 (4th Cir.1989). The legislative history and case law makes clear that in dismissing a Chapter 11 case, "[t]he court will be able to consider other factors [than those enumerated in § 1112(b)] as they arise, and to use its equitable powers to reach an appropriate

result in individual cases." *Id.* at 699 (quoting H.R.Rep. No. 595, 95th Cong., 2d Sess. 406, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5963, 6362); *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670, 674 (11th Cir.1984) (same); *In re Tornheim,* 181 B.R. 161, 163–164 (Bankr.S.D.N.Y. 1995) (Bernstein, C.J.), *appeal dismissed,* 1996 WL 79333 (S.D.N.Y.).

■ As Judge Feller of this Court's sister court has noted:

[t]he precise perimeters of 'cause' are intentionally omitted from the statute so as to afford maximum flexibility and, among other things, to enable a bankruptcy court to dismiss a Chapter 11 case for any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy reorganization process.

*In re HBA East, Inc.,* 87 B.R. 248, 258 (Bankr.E.D.N.Y.1988).

■ Here, the Court finds (a) the Debtor's violations of basic rules for management of a case under chapter 11; (b) the extraordinary instances of self-dealing on the part of Beeler; (c) the Court's belief that the investigation of Beeler's conduct requires the appointment of an independent trustee, and (d) the Court's total lack of confidence in Beeler's ability and inclination to comply with fiduciary duties of a debtor in possession all constitute further "cause" as well.

■ Section 1112(b) requires the court to engage in a two-step process in determining whether to convert or dismiss a chapter 11 case. *Rollex Corp. v. Associated Materials (In re Superior Siding & Window, Inc.),* 14 F.3d 240, 242 (4th Cir. 1994); *accord Bidermann v. RHI Holdings (In re Bidermann),* 1994 WL 376090

**30.** *See* Debtor Dism. Motion ¶ 11:

at *1–2, 1994 U.S. Dist. LEXIS 9700 at *4–5 (S.D.N.Y.1994) (Haight, J.) First, as a threshold matter, the court must determine whether cause exists either to convert or dismiss the case. After the court finds that cause exists, it then must decide whether it is in the best interests of creditors to simply dismiss the case, or to convert it to chapter 7.

■ The Code does not define the "best interests of creditors," but relevant case law makes it clear that courts are required to consider and weigh the totality of facts and circumstances of the individual case when determining what is in the best interests of creditors. Courts agree that ultimately, the determination of whether to dismiss a chapter 11 case, on the one hand, or to convert it, on the other, is a matter for sound judicial discretion. *See, e.g., In re BTS, Inc.,* 247 B.R. 301, 309 (Bankr. N.D.Okla.2000) (collecting cases).

■ When parties disagree on conversion or dismissal, as they do here, the court evaluates the alternatives, and chooses the alternative that would be most advantageous to the estate as a whole. *See* 7 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 1112.04[6] (15th ed. revised 2000). The court may consider any or all of the following factors in making this determination:

(1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal,

(2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted,

(3) whether the debtor would simply file a further case upon dismissal,

(4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors,

(5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise,

(6) whether any remaining issues would be better resolved outside the bankruptcy forum,

(7) whether the estate consists of a "single asset," [and]

(8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests.

*Collier* ¶ 1112.04[6].

■ Here, factors "(4)," "(5)" and "(8)" are applicable, but the last of them dwarfs the others in importance. As noted in the factual findings above, the Court finds gross misconduct in numerous respects, and probable cause to suspect it in others, and the Court considers it beyond serious question that the creditors are in need of a chapter 7 trustee to protect their interests. As in *In re Sal Caruso Cheese, Inc.,* 107 B.R. 808 (Bankr.N.D.N.Y.1989), in which Chief Judge Gerling of the Northern District of New York ordered conversion after a string of failures to comply with basic requirements for operation under chapter 11, "[t]he record reveals an absolute disregard of the strictures of the Bankruptcy Code or at best a calculated strategy of selective compliance." *Id.* at 818. *See also In re Citi–Toledo Partners,* 170 B.R. 602, 609 (Bankr.N.D.Ohio 1994) (where a debtor in possession has failed to perform its fiduciary duties, conversion is warranted). And conversion is particularly appropriate, in the Court's view, because given the extraordinary conflicts of interest affecting Beeler's past conduct and reasonably foreseeable future conduct, it is only with the appointment of a trustee that the Court can feel confident that cred-

itor interests, rather than Beeler's, are being advanced.[31]

The considerations here are closely similar to those in Judge Schwartzberg's decision in *In re Natrl Plants and Lands Management Co., Ltd.*, 68 B.R. 394 (Bankr.S.D.N.Y.1986)—though the facts here are more egregious. There, Judge Schwartzberg stated:

> There is also a question as to whether the debtor would be as impartially motivated to collect the amounts due from its affiliates and to determine whether or not preferential or otherwise avoidable transfers had been made to these affiliates or to its principal shareholder. Additionally, the debtor's track record has been something less than acceptable with respect to the timely submission of monthly operating reports.... In these circumstances, the interests of the creditors may be jeopardized by allowing the debtor to proceed with a liquidation without the benefit of an independent trustee's supervision. The debtor's principal shareholder is in no position to exercise undivided loyalty to the rights of all interested parties.

The court converted to chapter 7, noting that the creditors would be better served by a chapter 7 trustee whose sole commitment is to promoting parity among the parties rather than to self interest.[32]

▆▆▆▆ Thus, there is here an overwhelming case for conversion, subject only to consideration as to whether, by reason of the terms of the Partnership Agreement, Beeler's self-dealing and conflicts of interest are permissible and/or can be excused. But the Court rejects the notion that they are in any way a defense, as matters of fact, and also of law.

First, as matters of fact, section 4.5 of the Partnership Agreement does not, by its terms, cover anything other than the acquisition of goods and services by the partnership from its general partner, and does not cover any other kinds of self-dealing—such as agreements with respect to bidding for estate assets, and sharing in profits on those assets' resale, to the detriment of the Debtor partnership itself getting any such profit. Likewise, section 4.6 of the Partnership Agreement expressly speaks of transactions *other than in connection with the partnership*—not those in

---

**31.** For example, section 723 would permit a chapter 7 trustee to pursue Beeler for deficiency claims of the Debtor partnership. That a trustee would be able to do so "strongly favors conversion." *See Citi–Toledo*, 170 B.R. at 609. At the very least, a chapter 7 trustee could conduct an independent investigation into the transactions conducted by Beeler that came to light during the hearing.

**32.** The Debtor has argued that the Court should scrutinize the Debtor's conduct not in the manner described above, but rather by looking to see whether the UST showed a basis for the appointment of a chapter 11 trustee under section 1104; the Debtor has then argued that the Trustee failed to make such a showing.

The Court rejects that argument. While conversion to chapter 7 (with the resulting

appointment of a chapter 7 trustee) and the appointment of a chapter 11 trustee may both be warranted as a consequence of debtor misconduct, the analysis of the propriety of conversion from chapter 11 to chapter 7 starts, in the Court's view, with analysis of section 1112(b), and continues with analysis of the caselaw analyzing it— as exemplified by Judge Schwartzberg's analysis, but hardly limited to that. Here the Court is confident that grounds exist for appointment of a chapter 11 trustee under section 1104 as well, but since the Court finds there is nothing to reorganize and a potential need to invoke section 723, and finds (as the Debtor admitted) other section 1112(b) criteria present as well, conversion is more appropriate and will be ordered.

connection with partnership assets themselves.

Then, as another matter of fact (or mixed question of fact and law), the safe harbors granted by those provisions have been granted, and run with respect to claims, by *limited partners* of the Debtor, not the Debtor's creditors. No explanation has been proffered, nor can the Court see any, as to how any such safe harbors would address any duties to *creditors*.

Then, as still another matter of fact, the Partnership Agreement is silent as to its effect, if any, with respect to the duties of a debtor in possession in bankruptcy. And as a matter of law, the Court finds that provisions of that type (aside from the injustice of purporting to bind creditors, who were non-parties to the agreement), even if present, could not trump the duties of a debtor in possession, which, with exceptions not relevant here, takes on duties of a trustee under law. *See* Bankruptcy Code section 1107.[33] As the Debtor itself admits, "the Partnership Agreement is nonetheless tempered by the Bankruptcy Code's imposition of the higher duty of trust imposed upon a debtor-in-possession...."[34] The United States Supreme Court has made clear that a debtor in possession, like a chapter 11 trustee, owes the estate and its creditors a general duty of loyalty. In *Wolf v. Weinstein,* 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963), the Supreme Court noted (in the context of a corporate debtor but with words no less applicable to a debtor partnership) that:

> so long as the Debtor remains in possession, it is clear that the corporation bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession....

*Id.* at 649, 83 S.Ct. 969; *accord Commodity Futures Trading Commission v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) ("[I]f a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession.").[35]

The Debtor argues that the New York Partnership Law provides that parties may include in the Partnership Agreement any agreement they wish, including one permitting self-dealing.[36] Assuming, arguendo, that New York law allows such an agreement to be made, the effect of that agreement undergoes a change once the partnership files for bankruptcy. As Judge Lifland of this Court noted in *Johns–Manville,* once a corporation be-

---

**33.** That section provides, in relevant part:

> Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall ... perform all the functions and duties, except the duties specified in sections 1106(a)(2) [relating to the filing of lists, schedules and statements if the debtor has not done so], (3) [engaging in various investigations of the debtor's acts, assets, and affairs], and (4) [filing a report of investigation] of this title, of a trustee serving in a case under this chapter.

**34.** Debtor Post–Hrg. Br. 5.

**35.** Then, since business entities act only through the live people who manage their affairs, those duties devolve onto those people. In *Wolf,* the Supreme Court once more spoke of people managing a corporation, but in words equally applicable to people managing a partnership:

> It is equally apparent that in practice these fiduciary responsibilities fall not upon the inanimate corporation, but upon the officers and managing employees who must conduct the Debtor's affairs under the surveillance of the court....

372 U.S. at 649, 650, 83 S.Ct. 969.

**36.** *See* Debtor's Post–Hrg. Br. at 5, n. 4 (citing New York Partnership Law § 40).

comes a debtor under Chapter 11, its directors are no longer allowed to pursue parochial interests but have broader fiduciary obligations which encompass all aspects of the reorganization. *Manville Corp. v. Equity Sec. Holders Committee (In re Johns–Manville Corp.)*, 52 B.R. 879, 885 (Bankr.S.D.N.Y.1985), *aff'd*, 60 B.R. 842 (S.D.N.Y.), *rev'd* [on other grounds], 801 F.2d 60 (2nd Cir.), *on remand*, 66 B.R. 517 (Bankr.S.D.N.Y.1986). Judge Lifland quoted from the decision of the district court in *In re Baldwin–United Corp.*, 43 B.R. 443, 459 (S.D.Ohio 1984). The *Baldwin–United* court stated:

> It is ... noteworthy that "[t]he rule prevailing in most jurisdictions ... is that when the corporation becomes insolvent, the directors are thereafter considered as trustees for the corporate creditors." 3 *Fletcher Cyclopedia Corporations* § 849 (1945 ed.). It appears, then, that the directors of a Chapter 11 debtor are not fiduciaries of the corporation; rather, they are fiduciaries of the estate, which the debtor in possession holds as trustee for the creditors, 11 U.S.C. § 1107(a). Given that, it is difficult to accept debtors' position that, in effect, there is no difference in the relationship between the debtors and their directors pre- and post-petition, since the nature of the directors' duties has changed from helmsman to guardian.

43 B.R. at 459–60 n. 22. *See also Automatic Canteen Co. of America v. Wharton, (In re Continental Vending Machine Corp.)* 358 F.2d 587, 590 (2d Cir.1966) (holding that directors of an insolvent corporation are trustees for the creditors); *Davis v. Woolf*, 147 F.2d 629, 633 (4th Cir.1945) ("The law by the great weight of authority seems to be settled that when a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors...."); *Lilly v. Ernst*, 113 F.Supp. 178, 181 (D.C.W.Va.1952) ("Officers and directors of an insolvent corporation are trustees for its creditors.").

Once again, the principles recited above with respect to duties to creditors, though stated with respect to corporations, apply no less to partnerships.

*Collier* advises that:

> A debtor in possession is also bound by a duty of loyalty that includes an obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the estate.

*Collier* ¶ 1107.02[4]. Whatever dispensation may be provided in a Partnership Agreement with respect to matters of that character, that dispensation does not carry over when the debtor becomes a debtor in possession in chapter 11.

Thus, whatever safe harbors may exist protecting the general partner Beeler vis-à-vis claims of limited partners, they have no relevance to the duties of a debtor in possession to its creditors, and to the bankruptcy system, in a chapter 11 case. To the extent any provisions in the Partnership Agreement have the purpose or effect of authorizing any dealings by Beeler here that would otherwise be a breach of the fiduciary duties he has while acting as the general partner of the debtor in possession, they will not be enforced, and will not be regarded as a defense to a motion to convert based on such breaches of fiduciary duty.

### Conclusion

For the foregoing reasons, this case is converted to a case under chapter 7.

IT IS SO ORDERED.